Samson **DUBRIA**, Petitioner–Appellant,

v.

**G.A. SMITH, Warden, Respondent–Appellee.**

No. 98–55914.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1999

Opinion Filed Nov. 19, 1999

Order Granting Rehearing En Banc Filed March 9, 2000

Argued and Submitted En Banc June 22, 2000

Filed Sept. 11, 2000

Charles M. Sevilla, Cleary & Sevilla, San Diego, CA, for petitioner-appellant.

Frederick R. Millar, Jr., Office of the State Attorney General, San Diego, CA, for respondent-appellee.

Before: HUG, Chief Judge, SCHROEDER, PREGERSON, FERNANDEZ, RYMER, T.G. NELSON, KLEINFELD, HAWKINS, THOMAS, GRABER, and GOULD, Circuit Judges.

Opinion by Judge MICHAEL DALY HAWKINS: Dissent by Judge PREGERSON

MICHAEL DALY HAWKINS, Circuit Judge:

Dr. Samson Dubria ("Dubria"), a California state prisoner, appeals the district court's denial of his federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter was heard originally before a three-judge panel of this court. We accepted the case for en banc review and now affirm the district court. Our jurisdiction is pursuant to 28 U.S.C. § 1291.

## BACKGROUND

Dubria was found guilty following a jury trial of first degree murder, rape by the use of drugs, and administering a drug in order to enable and assist himself to commit a felony. Dubria was given a mandatory sentence of life in prison without the possibility of parole. Following the denial of his consolidated direct and collateral appeals in state court, Dubria sought habeas relief in district court.

The relevant events began in 1990 when Dubria became friends with Jennifer Klapper ("Klapper") while the two were co-workers at an Ohio hospital. Their rela-

tionship was not romantic. Klapper had stated that she was not physically attracted to Dubria and, at the time of her death, she was romantically involved with another man with whom she was discussing marriage. In the spring of 1991, Dubria invited Klapper to attend his class reunion in California. Klapper was a television and movie fan and did not have the financial means to take a trip to California on her own. She also expressed reservations about the invitation. She told a friend that she felt uncomfortable about going on the trip because she did not know what Dubria expected from her. She also told her boyfriend that she did not want to be away from him. Klapper's sister overheard a telephone conversation in which Klapper told Dubria that their relationship was platonic and that she had a boyfriend. Further, she told Dubria that if he expected to have physical relations while on the trip, she would have to cancel her plans to go.

Dubria flew to California alone and in advance of Klapper and then picked her up at the airport several days later. The pair spent the next few days touring Southern California, spending their evenings at the home of Dubria's parents and sleeping in separate rooms. On August 15, 1991, after watching a taping of the Johnny Carson Show, they planned on camping overnight at the San Elijo State Beach Campground between Los Angeles and San Diego. Instead of camping out, the pair checked into the Allstar Inn in Carlsbad, California.

At about 3:09 a.m., Carlsbad police responded to a 911 call at the Allstar Inn. Klapper was lying unconscious on the bed closest to the door. She had no pulse and was not breathing. Dubria and a police officer administered CPR. Firefighters and paramedics arrived shortly thereafter and were able to restore some electrical activity in Klapper's heart, but not a normal beat. Neither the police nor any of the emergency personnel smelled a chemical odor in the room. Klapper was immediately transferred to a local hospital where further attempts to revive her were unavailing. Emergency room physicians pro-

nounced Klapper dead at 3:52 a.m., but were unable to determine a cause of death.

Several hours after her death, Klapper's body was examined by a coroner's investigator, who noticed that Klapper was missing an earring in her left ear, and the lycra pants she was wearing were on inside out. The investigator also noticed scratches on her face, including a half-moon scratch on her left cheek. The investigator examined the room at the Allstar Inn and in the trash can found a beer can, a carton of fuzzy navel mixed drink, and a styrofoam cup containing a yellowish liquid. None of the items had any odor except that of alcohol, and they were not preserved.

Dubria willingly spoke with Carlsbad police officers three times during the early morning of August 16, relating essentially the same story each time: he and Klapper had planned on staying at a campsite that night and when their plans to stay at the campsite fell through, they decided to get a motel room. They arrived at the Inn at about 11:30 p.m. He drank a beer and a mixed drink and Klapper had a few sips of the mixed drink. Klapper moved over on the bed she was lying on and signaled for Dubria to join her. He put his arm around her and they cuddled in the bed. They talked, kissed, and eventually had sex. He stated that, before they had intercourse, he asked her if she was using any birth control and she told him that she was taking birth control pills. After they had intercourse, Klapper went to the bathroom, then Dubria went to the bathroom, and they went to sleep in the same bed.

Dubria stated that, after Klapper fell asleep, she tossed and turned. At about 3:00 a.m., he awoke to go to the bathroom. While in the bathroom, he heard a "thud" and a moan and, when he returned, he found Klapper on the floor. She was not breathing and had no pulse. He administered CPR for about five minutes. He then panicked and, instead of calling 911 from the room, he ran out of the room for help. The person working in the motel office told him to call 911 from his room.

He ran back to the room, found himself locked out, ran back to the motel office, got a spare key, and ran back to the room to call 911. The police arrived a few minutes later. Dubria, who had been with Klapper almost continuously that day and night, stated that he had no idea why she died.

After Dubria returned to the medical facility where he was working in New Jersey, an autopsy was performed on Klapper's body. The examiner, forensic pathologist Dr. Leena Jariwala, found some cuts and abrasions on Klapper's right eyelid, her right chin, her left cheek, and the tip of her nose. Dr. Jariwala concluded that these injuries were inflicted before Klapper's heart stopped beating. Dr. Jariwala and the emergency personnel also concluded that these injuries were inconsistent with the efforts of emergency personnel to revive her on the night of her death. Dr. Jariwala's examination also revealed that Klapper had sexual intercourse relatively close to the time of her death. After completing the autopsy, Dr. Jariwala could find no cause of death.

Toxicological tests were performed and the only anomalous result was a heightened level of chloroform in Klapper's blood, liver tissue, and gastric organs. Dr. Jariwala concluded that the cause of death was chloroform intoxication.

On October 23, 1991, Carlsbad detectives visited Dubria at his New Jersey home. They interviewed him at a nearby office. The officers told Dubria that they believed he had accidently murdered Klapper when he administered chloroform in order to rape her. Dubria stuck to his story that he had no idea how Klapper had died and specifically denied trying to rape her or playing any role in her death. The officers did not arrest Dubria that day but later charged him with Klapper's rape and murder.

At trial, Dr. Lucien Morris, a state expert with extensive knowledge of chloroform, explained that chloroform is an extremely potent and dangerous anesthetic. He stated that the standard method for administration of chloroform was to place one drop on a cloth over a patient's face, return in one minute and place two drops on the cloth, then return in another minute and again double the dose and so on until the desired level of anesthesia is reached. This method avoids sudden exposure to concentrations of chloroform, which can be lethal. Chloroform is now seldom used because the margin of error between enough chloroform and too much is very small.

Dr. Morris noted that death from chloroform inhalation can occur when a small amount of chloroform is inhaled suddenly. The concentration of chloroform in the blood rises quickly and disrupts the heart. The amount of chloroform that can cause death under these circumstances is very small. Dr. Morris also noted the dangers of administering chloroform to a sleeping person. He explained that, if the person awakened and became frightened, the resulting release of adrenaline could interact adversely with the chloroform. Dr. Morris concluded that Klapper had died from a sudden inhalation of a small dose of chloroform.

Dr. Morris also stated that, although chloroform has a strong odor, the odor does not persist. He testified, that assuming Dubria administered chloroform to Klapper in the motel room, it would have been possible for the smell to have dissipated before the police and emergency personnel arrived.

Dr. Gregory Schwartz, the defense medical expert and an emergency room physician, agreed with Dr. Morris about the dangers of chloroform. Dr. Schwartz concluded that Klapper died after having ingested, rather than inhaled, chloroform. He noted that chloroform's use as a recreational drug is on the rise, although it is still relatively rare. He thought Klapper had overdosed on chloroform. He stated that, if she had inhaled chloroform, the odor would not have dissipated before the police and emergency room personnel arrived because the smell would persist in a

closed room for eight to twelve hours. He noted that, if Klapper had ingested the chloroform, less vapor would have evaporated and there would be less of a smell. He conceded, however, that one could get rid of the smell of chloroform quickly. Dr. Schwartz also believed that the injuries to Klapper's face were consistent with attempts to revive her.

Dubria took the stand in his own defense. He stated that his relationship with Klapper was not platonic. Before he and Klapper had gone to California, he had been on several formal dates with her. He had been attracted to her since early in their relationship and he had first kissed and cuddled with her in April 1991, and then again in May 1991 after going bowling. Dubria's testimony about the night of Klapper's death was consistent with the story that he had repeated to police immediately after Klapper's death and at the later interview in New Jersey.

The jury convicted Dubria of first degree murder, rape by the use of drugs, and administering a drug in order to enable and assist himself to commit a felony. On the murder charge, the jury also found the special circumstance of rape to be true, and Dubria was sentenced to life in prison without the possibility of parole. Dubria appealed to the California Court of Appeal. His direct appeal and state habeas petition were consolidated and both were denied in a written unpublished opinion on July 18, 1995. His petition for review by the California Supreme Court was denied without opinion on October 19, 1995, and his petition for a writ of certiorari to the United State Supreme Court was denied on February 20, 1996, *Dubria v. California,* 516 U.S. 1118, 116 S.Ct. 923, 133 L.Ed.2d 852 (1996).

Dubria filed the instant habeas petition in federal district court, which denied the petition on the merits. He timely filed an appeal and a three-judge panel reversed the district court, *see Dubria v. Smith,* 197

F.3d 390 (9th Cir.1999). We granted the state's petition for en banc review.

## STANDARD OF REVIEW

We review the district court's decision to grant or deny habeas relief *de novo. See McNab v. Kok,* 170 F.3d 1246, 1247 (9th Cir.1999) (per curiam). State court findings of fact are given a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1) (1996); *Jeffries v. Wood,* 114 F.3d 1484, 1499–1500 (9th Cir.1997) (en banc). The district court's factual findings are reviewed for clear error. *See Houston v. Roe,* 177 F.3d 901, 905 (9th Cir.1999). Claims of ineffective assistance of counsel are mixed questions of law and fact and are reviewed *de novo. See Crotts v. Smith,* 73 F.3d 861, 864 (9th Cir.1996), *superseded by statute as stated in Van Tran v. Lindsey,* 212 F.3d 1143 (9th Cir. 2000).[1]

## ANALYSIS

1. *The Pre–Arrest Interview*

Dubria claims constitutional error from the admission of the unredacted tape and transcript of his New Jersey interview by police detectives. During this interview, the detectives, in particular Detective Detar, challenged Dubria about his explanation of the events and repeatedly told him that no judge or jury would believe him if he stuck to his story. The state claims that Dubria procedurally defaulted on this issue by failing to make a contemporaneous objection at trial. The state also argues in the alternative that, even if there is no procedural bar, the district court did not commit error in admitting the unredacted tapes.

We conclude that we may examine the merits of this issue because defense counsel made a sufficiently broad objection at trial and because the state appears to have waived any procedural bar by failing to

1. Dubria filed his petition before the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Therefore, AEDPA's

changes to our standard of review do not apply here. *See Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

raise the issue in its response to the habeas petition, *see United States v. Barron,* 172 F.3d 1153, 1156 (9th Cir.1999) (en banc). "Because there are no extraordinary circumstances present in this case which would suggest that justice would be served by overlooking the government's omission," *id.* at 1156–57, we conclude that even if defense counsel's objection was not adequate, the State waived its right to claim procedural default.

 Reaching the merits of this claim, we conclude that Dubria cannot meet the standard that the admission of the tape and transcript "so fatally infected the proceedings as to render them fundamentally unfair." *Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991). " '[F]ederal habeas corpus relief does not lie for errors of state law.' " *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)). Therefore, we cannot grant habeas relief upon reexamination of state-court determinations of questions of state law; we can grant relief only when the conviction "violate[s] the Constitution, laws, or treaties of the United States." *Id.* at 68, 112 S.Ct. 475.

The question before us is whether admission of the unredacted tape and transcript violated Dubria's constitutional right to due process. Dubria acknowledges that the tape and transcript were admissible for a limited purpose—to show that, when confronted with the toxicological tests, Dubria could not and did not explain why a woman he was continuously alone with for the prior 24 hours suddenly turned up dead from chloroform intoxication. When

confronted with the toxicological tests, Dubria maintained that he was not involved in Klapper's death. He also suggested that maybe Klapper took the chloroform herself or that both of them may have been exposed to chloroform when they drove behind a chemical truck.

Dubria claims instead that certain portions of the tape and transcript should have been redacted. He argues that Detective Detar's comments and questions contained statements of disbelief of Dubria's story, opinions concerning Dubria's guilt, elaborations of the police theory of Klapper's death, and references to Dubria's involvement in the crime. Viewed in its entirety, however, the tape and transcript show what the state appellate courts quite properly described as an "unremarkable interview." [2] The questions and comments by Detective Detar placed Dubria's answers in context, much like a prosecutor's questions at trial. There was nothing in Detective Detar's statements that suggested evidence or theories of the case that were not presented at trial.

 Nor do we find conclusive the argument that the jury impermissibly gave the comments added weight because they were made by a law enforcement officer. Although we have cautioned that testimony of law enforcement officers " 'often carries an aura of special reliability and trustworthiness,' " *United States v. Gutierrez,* 995 F.2d 169, 172 (9th Cir.1993) (quoting *United States v. Espinosa,* 827 F.2d 604, 613 (9th Cir.1987)), we examine officers' statements in context to determine whether they fundamentally affect the fairness of the trial, *see id.* (no error in introduction of evidence).[3] Here, Detective De-

---

**2.** The California Court of Appeal concluded that it found the interview

> generally unremarkable. There is no doubt the officers were accusatory and suggested in a variety of ways they did not believe appellant. The jury would certainly understand this to be the police position and would give to it no more weight than they would the fact appellant was charged by the prosecutor with murder or that the prosecutor clearly also disbelieved appellant.

... The officers' comments, however, suggested no more than what the People proposed to prove at trial. There was nothing particularly damning in the officers' statements or suggestions of evidence or theories that the People did not present or offer at trial.

**3.** We do not assume that the opinions of an investigating officer are presumptively prejudicial. *Cf. United States v. Harber,* 53 F.3d 236, 238, 240–41 (9th Cir.1995) (presuming

tar's statements were questions in a pretrial interview that gave context to Dubria's answers. They were not the types of statements that carry any special aura of reliability. *Cf. Gutierrez*, 995 F.2d at 172 (district court did not abuse discretion in admitting officer's testimony in court that defendant's behavior was "furtive"); *Espinosa*, 827 F.2d at 612 (officer's expert testimony in court that defendant acted in accordance with usual criminal modus operandi was admissible).

■ Furthermore, even if it was error to admit the tapes and transcripts without redacting Detective Detar's statements, any error was cured by the judge's two cautionary instructions. In response to an objection by defense counsel, the judge told the jury:

> Ladies and gentlemen, you should view the questions and answers in the same way that you view the question[s] and answers in the courtroom. In other words, the questions are only pertinent as they may explain what the answers themselves are. You are not to assume as true anything that Detective Detar says in his questions. The questions are only pertinent as they give meaning to the answers.

Later, the judge repeated to the jury:

> Again I want to caution you, too, you are not to consider any of the statements that Detective Detar makes for the truth of the matters asserted in those statements. Those are just questions or statements in the forms—questions in the form of statements. They are not to be considered for the truth, they are only to be considered as how they may give meaning to the answers.

Any impression that the jury may have had that it could consider Detective Detar's statements to be true was specifically

and timely corrected by the trial judge. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Ordinarily, a cautionary instruction is presumed to have cured prejudicial impact. *See United States v. Merino–Balderrama*, 146 F.3d 758, 764 (9th Cir.1998).

This is not a case in which the statements at issue are so clearly prejudicial that a curative instruction could not mitigate their effect. Dubria attempts to draw an analogy to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in which the Supreme Court concluded that a curative instruction was insufficient to mitigate the prejudicial effect of a co-defendant's confession that implicated the appellant. In that case, the Court held that the jury could not perform the overwhelming task of considering the confession in determining the guilt of the co-defendant and then ignoring it when determining the guilt of the appellant.[4] *See id.* at 131, 88 S.Ct. 1620. Here, in contrast, the jury had to simply do what it is asked to do all the time—consider the questions posed by Detective Detar as mere questions and not as evidence.

Further, the Court in *Bruton* based its holding in part on the fact that the co-defendant never testified at trial and, therefore, that the appellant was denied his constitutional right of confrontation. *See id.* at 128, 88 S.Ct. 1620. Here, there was no denial of that right, as both Detective Detar and Dubria took the stand and could be questioned about the interview.

■ Finally, while it is clear that, under California law, tapes should be redacted to remove material that is either impermissible or would unfairly prejudice the defense, *see People v. Sanders*, 75 Cal. App.3d 501, 508, 142 Cal.Rptr. 227 (1977),

prejudice when law enforcement officer's report, introduced into evidence only for identification and to refresh officer's memory as to certain facts, which included statements that officer thought defendant was guilty, was mistakenly given to the jury for their deliberations and was read by them).

4. The facts of *Bruton* were even more compelling, in fact, because the co-defendant's conviction was reversed on the ground that his confessions were inadmissible against him, and on retrial he was acquitted. *See id.* at 133 n. 9, 88 S.Ct. 1620.

"not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly*, 416 U.S. at 642, 94 S.Ct. 1868 (quoting *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). We conclude that admission of these comments and statements did not violate Dubria's fundamental right to due process.

### 2. Prosecutor's Closing Argument/Ineffective Assistance of Counsel

While en banc review of this appeal was pending, the Supreme Court decided *Slack v. McDaniel*, —— U.S. ——, —— —— ——, 120 S.Ct. 1595, 1600–01, 146 L.Ed.2d 542 (2000). *Slack* held that AEDPA governs the right to appeal a district court's dismissal of a habeas petition, like Dubria's, pending on AEDPA's effective date, April 24, 1996. *Id.*

AEDPA amended 28 U.S.C. § 2253, which now provides, in pertinent part, that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.... The certificate of appealability ... shall indicate which specific issue or issues satisfy the showing requirement." *Slack* held that the court of appeals should have treated the petitioner's notice of appeal as an application for a certificate of appealability ("COA"). It then examined the issues to determine if any met the showing requirement. *See id.* at 1603. If Dubria had not filed a motion for a COA in the district court, we could treat his notice of appeal as a motion for a COA, and *Slack* would not change our ability to consider any issue we concluded met the showing requirement. *See Schell v. Witek*, 218 F.3d 1017 at n. 4 (9th Cir.2000) (en banc). Dubria, however, did file a motion for a COA in the district court and the district court explic-

itly refused to certify for appeal the issue of trial counsel's failure to object to statements made by the prosecutor in closing argument that Dubria was a liar, that he made up a story, and that the story was "garbage."[5]

The original panel, ruling without the benefit of *Slack*, followed our precedent, and that of seven other circuits, and held that the district court improperly applied the COA procedure because Dubria's petition was filed prior to AEDPA's effective date. The panel concluded that it was not limited by the COA and could address all issues on appeal. The panel relied in part on defense counsel's failure to object to the "garbage" statement made by the prosecutor to conclude that defense counsel provided ineffective assistance.

 Considering this issue on the merits, however, we conclude that defense counsel did not provide ineffective assistance. Dubria's claim arises out of trial counsel's failure to object to the following portion of the prosecutor's closing argument:

> But to get up here and get on the stand and look at you people and tell you the story that he told you in front of the family, this piece of garbage, making up every little bit of it, he's the biggest liar you've ever encountered. He's worse than that. I'm not going to tell you. You can imagine some of the things I could tell you what he really is. I'm not going to tell you, because you know. You know in your hearts what else.

To establish ineffective assistance of counsel, Dubria would have to show that his trial counsel's failure to object to these statements fell outside the wide range of professionally competent assistance and that this deficient performance prejudiced his defense. *See Strickland v. Washing-*

---

5. Circuit Rule 22–1, effective January 1, 1999, requires that a petitioner file a motion in the court of appeals to expand a COA where the district court partially granted the COA. The parties neither briefed nor argued on appeal before the original panel or before the en

banc court whether Circuit Rule 22–1 precludes review of the "garbage" issue, *see United States v. Zuno–Arce*, 209 F.3d 1095, 1099–1100 (9th Cir.2000), and we decline to reach the issue here.

*ton,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■■■ Both the California Court of Appeal and the district court found that the "piece of garbage" reference, when read in context, referred to Dubria's story, not to Dubria himself. We see no reason to disagree. *Cf. Williams v. Borg,* 139 F.3d 737, 744–45 (9th Cir.1998) (prosecutor's reference to defense argument as "trash" not improper). Furthermore, even assuming that "piece of garbage" referred to Dubria, we would not conclude that trial counsel fell below the *Strickland* standard by not objecting. *Cf. United States v. Laurins,* 857 F.2d 529, 539 (9th Cir.1988) (statement that defendant was a liar could be construed as a comment on the evidence). While it is clear that prosecutors cannot express their opinion about a defendant's guilt or vouch for government witnesses, *see United States v. Molina,* 934 F.2d 1440, 1444 (9th Cir.1991), a prosecutor is free to voice doubt about the veracity of a defendant's story. *See United States v. Sarno,* 73 F.3d 1470, 1496–97 (9th Cir. 1995); *Molina,* 934 F.2d at 1445 (the inference that one side is lying is unavoidable).

■■■ Dubria also claims that the last four lines of this portion of the prosecutor's closing argument improperly suggested to the jury that the prosecutor had personal knowledge of Dubria's character and guilt.[6] The prosecutor called Dubria a liar. He then stated that Dubria was "much worse than that. I'm not going to tell you. You can imagine some of the things I would tell you ... I'm not going to tell you, because you know." The meaning of these words is unclear. These lines could refer to Dubria as a murderer and a rapist—what the prosecutor was trying to prove at trial. Given the ambiguity in these words, we conclude that a reasonably competent attorney could have refrained from objecting.

### 3. *Remaining Claims*

We have also considered Dubria's other claims of violation of *Miranda,* instruction-

al error, ineffective assistance of counsel, insufficiency of the evidence, exclusion of evidence of Klapper's knowledge of birth control methods, and unconstitutionality of his sentence, and hold that they are without merit.

AFFIRMED.

PREGERSON, Circuit Judge, dissenting:

Dubria did not get a fair trial. The trial judge allowed the state, in its case-in-chief, to place into evidence a tape of a pre-arrest interview of Dubria. On that tape, Detective Detar made highly inflammatory statements in an effort to elicit information from Dubria about the circumstances surrounding Jennifer Klapper's death. Later, a transcript of the tape was given to the jury. Because I believe that admitting the tape and transcript of the pre-arrest interview into evidence violated Dubria's due process right to a fair trial, I respectfully dissent.

The pre-arrest interview of Dubria contained in the tape and transcript was not innocuous. During the interview, Detective Detar repeatedly: (1) stated that he believed that Dubria was responsible for Klapper's death; (2) told Dubria that the judge and jury would not believe his story; and (3) stated that other witnesses and evidence existed that proved that Dubria was responsible for Klapper's death. Indeed, the tape and transcript of the pre-arrest interview included long narratives during which Detective Detar reiterated his opinion that Dubria was responsible for Klapper's death. For example, the interview included the following exchanges:

> Detar: I think, that this was probably just an accident, okay. But there's no question ...
>
> Dubria: But detective ...
>
> Detar: But listen. Wait, wait, wait ... let me finish, let me finish.
>
> Dubria: Okay.

---

**6.** The district court certified this issue for appeal.

Detar: There's no question. The evidence is conclusive.

Dubria: No.

Detar: That your [sic] responsible. Okay?

Dubria: No.

\* \* \*

Dubria: Okay, detective, can I ask you a question ... unintelligible ...

Detar: Sure.

Dubria: Because your [sic], you saying that I had something to do with her death. What, what's the evidence that you [sic] telling me that I have to do it ...

Detar: Wait, wait, wait, wait, wait, wait, wait, wait a minute, wait a minute. I'm not here to play any kind of game.

Dubria: I understand.

Detar: I want you to understand something. You know what happened there and, and I know what happened there ...

Dubria: Okay.

Detar: So now this is the opportunity for you to come clean, for you to do something good for you to day ... (sound of sigh), look guys I need to tell you something.

Dubria: Um-hum.

Detar: ... a, this is what happened.

Dubria: Um-hum.

Detar: Um, I messed up and I'm sorry.

Dubria: Um-hum.

Detar: Um, I believe and there's no doubt in my mind.

Dubria: Um-hum.

Detar: That you caused her death. And I don't think that your [sic] a murderer or anything like that ...

Dubria: Uh.

Detar: But a, I have no doubt that, that you caused her death. Okay?

Dubria: That's a, that's a strong accusation ...

Detar: So what I'm asking this, you know, I'm not accusing you of anything. I'm stating what I feel the facts are.

Dubria: Right.

Detar: And the facts show that your [sic] responsible for it. . . .

\* \* \*

Detar: I, I'm just flabbergasted, I, to be honest with you Sam, I think your [sic] digging yourself in a hole ...

Dubria: Um-hum.

Detar: ... that is going to cause you more grief cause I'll tell you something. What's gonna happen is ... either "A" your [sic] a cold blooded murderer ...

Dubria: No, I'm not.

Detar: Listen to me. Listen to me. This is important for you to understand. I want you to grasp this because I do care. Okay, if you lie to us, then the jury and everybody else in the world is gonna say, he's a cold blooded murderer. Okay? Listen to me I'm not done yet. Okay. Now listen to me.

Dubria: Alright.

Detar: Either "A", that's what [sic] gonna happen, or "B" it's gonna come across like, he made a mistake. It was an accident. He didn't mean to kill her, as a matter of fact he was so distraught and upset about the fact, that he did CPR, he called the paramedics, it was a mistake, it was an accident. The jury and the judge will believe that. They're not going to believe all these lies.

As evidenced by the excerpts, for long periods of time during the interview Detective Detar simply stated his opinion about what happened to Klapper and did not ask Dubria any questions. At one point, Detar explained to Dubria his theory about what occurred the night Klapper died. When Dubria protested that Detective Detar was "putting words in [his] mouth," Detar replied, "I really believe this." Additionally, Detective Detar repeatedly told Dubria that no one on the jury would believe his story:

Detar: I [can write down your version of the events w]hich everybody in the

world is gonna know is a lie, or I can tell them the truth about the issue. That there was a mistake, that it was an accident . . .

 \* \* \*

Detar: They're not gonna believe that you have no clue as to how she died. Think about it!

 \* \* \*

Detar: Sam, I want you to think about what your [sic] saying. I want you to think, you gotta get something good going for you. If you tell that story man, there ain't nobody that's going to believe that.

 \* \* \*

Detar: I realize what your story is. What I'm trying to tell you is, it's obvious to everybody that that's not the truth.

Moreover, several times during the interview Detective Detar referred to other "evidence" that established that Dubria was responsible for Klapper's death. This other "evidence" was not introduced at trial because it did not exist. Detar simply referred to such evidence as an interrogation tactic to get Dubria to admit that he was guilty. But the jury heard the tape and read the transcript and thus was given the distinct impression that other evidence, apart from the evidence admitted at trial, proved that Dubria was guilty. For example, the tape and transcript included the following exchanges:

Detar: Okay. If I told you someone said you were responsible for her death, what would you say?

 \* \* \*

Detar: Talked to a lot of people.

Dubria: Um-hum.

Detar: And a, pretty much, we've determined that you are responsible for her death.

 \* \* \*

Detar: You don't have any access to chloroform?

Dubria: No.

Detar: So all the people that I talked to that say that chloroform is all over the hospital, will say, are liars?

 \* \* \*

Detar: We've got experts, medical examiners, toxicologist . . .

Dubria: Um.

Detar: They did all the tests Sam!

Dubria: Um.

Detar: She died of chloroform poisoning. There were [sic] no other causation, absolutely zip. She died of an overdose of chloroform.

 \* \* \*

Detar: Yeah. Let me tell you something. It's not just the chloroform intoxication that points to you.

Dubria: Okay.

Detar: There's a lot of other things that point right at you.

The State proffered the unedited tape of the interview in its case-in-chief to show that Dubria had no explanation for the presence of chloroform in Klapper's body. Although only a small portion of the interview actually dealt with the presence of chloroform in Klapper's body, the entire interview was entered into evidence. None of Detar's inflammatory statements were excised from the tape before it was played to the jury. Later, over Dubria's counsel's objection, a transcript of the interview was given to the jury. Like the tape, the transcript was not edited at all.

The majority opinion concludes that, "viewed in its entirety," the tape and transcript merely show an "unremarkable interview" because, according to the majority, "[t]here was nothing in Detective Detar's statements that suggested evidence or theories of the case that were not presented at trial." *See* Maj. Op. at 1001. I disagree. In the interview, Detective Detar did suggest that other evidence existed that was not presented at trial. Specifically, Detar falsely stated that other individuals had claimed that Dubria was responsible for Klapper's

death, that all of the state's experts did "all the tests" and determined that Klapper positively died from chloroform poisoning, and that chloroform was "all over the hospital" where Dubria worked. Thus, I disagree with the majority's characterization of the interview as "unremarkable."

Additionally, the introduction of the tape and transcript of the pre-arrest interview is particularly troubling because the prosecution's evidence against Dubria was far from overwhelming. By entering into evidence the tape and transcript, the prosecution was able to present the jury with Detective Detar's theory of how and why he thought that Dubria killed Klapper. The long narratives by Detective Detar only served to inform the jury of Detar's otherwise inadmissible opinion that he had no doubt that Dubria had caused Klapper's death, and that no one—not the judge or jury—would believe Dubria's version of events. It is unrealistic to believe that such prejudicial evidence did not impact the jury's ability to evaluate, fairly and objectively, the evidence against Dubria.

Moreover, it is also significant that the inflammatory statements, which the jury heard and read, were made by Detective Detar, an investigating officer in the case. We have repeatedly acknowledged the inherent danger in admitting opinion testimony of law enforcement officers because we recognize that such testimony "carries an aura of special reliability and trustworthiness." *United States v. Gutierrez*, 995 F.2d 169, 172 (9th Cir.1993) (quoting *United States v. Espinosa*, 827 F.2d 604, 612 (9th Cir.1987)). Indeed, in *United States v. Harber*, 53 F.3d 236 (9th Cir.1995), we noted that the admission of an investigating officer's opinion about the defendant's guilt is a "classic example of presumptive prejudice." 53 F.3d at 241. And in *Harber* we held that "extrinsic material consisting of a governmental official's summary of the prosecution's evidence, and his recommendation that an indictment should be requested because the accused is guilty, is *inherently or presumptively prejudicial* where it is read and relied upon by the

jury." *Id.* (emphasis added). I see no valid basis for distinguishing *Harber* from the present case. In both cases the jury read and relied on extrinsic evidence that consisted of an investigating officer's opinion that the defendant was guilty. Consequently, I believe that admitting the tape and transcript of the pre-arrest interview in this case was "presumptively prejudicial."

Given the highly inflammatory content of the tape and transcript, and that the statements were made by an investigating officer, I conclude that the admission of the evidence "so fatally infected the proceedings as to render them fundamentally unfair." *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991). The trial judge did give the jury cautionary instructions. But, in light of the extremely prejudicial nature of Detar's statements, as well as the fact that a transcript of the interview was also later given to the jury, *see United States v. Hernandez*, 27 F.3d 1403, 1408 (9th Cir.1994) (noting that juries may put undue emphasis on particular testimony if provided with transcripts), I cannot conclude that the instructions cured the impact of Detar's statement on the fairness of Dubria's trial, *see United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir.1988) (finding under the circumstances that "the trial court's curative instruction to the jury was not sufficient to obviate the prejudice.").

Additionally, in contrast to the majority opinion, I believe that Dubria's ineffective assistance of counsel claim has merit. Dubria's ineffective assistance of counsel claim is based on his trial counsel's failure to object during closing argument when the prosecutor called Dubria a "piece of garbage" and suggested that he had personal knowledge of other bad acts committed by Dubria. The prosecutor stated:

But to get up here and get on the stand and look at you people and tell you that story that he told you in front of the family, this piece of garbage, making up every bit of it, he's the biggest liar

you've ever encountered. He's a lot worse than that. I'm not going to tell you. You can imagine some of the things I would tell you what he really is. I'm not going to tell, because you know. You know in your hearts what else.

To establish ineffective assistance of counsel, Dubria must demonstrate that his counsel's failure to object was deficient, and that the deficient performance prejudiced Dubria's defense. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Clearly, Dubria's counsel's failure to object was deficient. The prosecutor engaged in misconduct when he suggested that Dubria was a "piece of garbage."[1] *See United States v. Sanchez,* 176 F.3d 1214, 1225 (9th Cir.1999) (prosecutor commits misconduct when denigrating the defense as a sham); *United States v. Molina,* 934 F.2d 1440, 1444 (9th Cir.1991) (prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of the government's witnesses). And the prosecutor disregarded his obligation "to avoid improper suggestions, insinuations, and especially assertions of personal knowledge," *United States v. Edwards,* 154 F.3d 915, 921 (9th Cir.1998), when he told the jury that Dubria: "is a lot worse than [the biggest liar you've ever encountered]. I'm not going to tell you. You can imagine some of the things I would tell you what he really is." There was certainly no tactical advantage to be gained by Dubria by allowing the prosecutor to make such improper comments. Therefore, I would find that Dubria's counsel's failure to object to closing argument fell below the objective standard of reasonable representation.

Whether the ineffective assistance prejudiced Dubria's defense is a closer question. To demonstrate prejudice, Dubria "must show that there is a reasonable probability that, but for counsel's unpro-

fessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Although Dubria's counsel's deficient performance alone may not have altered the outcome of Dubria's trial, I conclude that the cumulative impact of the prejudice from this harm and that harm caused by the admission of the unredacted tape and transcript of Dubria's pre-arrest interview, deprived Dubria of his right to a fair trial. *See Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir.1992).

Accordingly, I would reverse the district court's denial of Dubria's habeas petition.

---

1. I disagree with the majority's conclusion that the prosecutor was simply referring to Dubria's *story* when he stated "this piece of garbage." Nonetheless, if the prosecutor had indeed been referring to Dubria's story when he said "this piece of garbage," an objection from the defense would have resulted in clarification for the jury. The statement is certainly unclear, and a reasonable person could conclude that the prosecutor was calling Dubria "a piece of garbage."