**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHAY'IM BEN-SHOLOM, AKA Ryan
Michael Marshall,
            *Petitioner-Appellant,*

            v.

ROBERT L. AYERS,
            *Respondent-Appellee.*

No. 09-99014

D.C. No.
1:93-cv-05531-AWI

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Chief District Judge, Presiding

Argued and Submitted
January 19, 2012—San Francisco, California

Filed April 2, 2012

Before: M. Margaret McKeown, Richard R. Clifton, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge McKeown

**COUNSEL**

Michael R. Levine (argued), Law Office of Michael R. Levine, Portland, Oregon; Michael Snedeker (argued), Snedeker and Short, Portland, Oregon, for the petitioner-appellant.

Lewis A. Martinez (argued), Office of the Attorney General of California, Fresno, California, for the respondent-appellee.

**OPINION**

McKEOWN, Circuit Judge:

This appeal stems from the murder of Silva Teague during a burglary and robbery gone wrong in rural California. In 1986, Chay'im Ben-Sholom[1] was convicted of the murder and sentenced to death. In 2008, the district court granted habeas relief as to Ben-Sholom's claim of ineffective assistance of

---

[1]At the time of the crime and his trial in state court, Ben-Sholom's name was Ryan Michael Marshall. He changed his name to Chay'im Ben-Sholom after his conviction.

counsel during the penalty phase of trial, vacated the capital sentence, and ordered a re-trial as to the sentence or the imposition of a life sentence without the possibility of parole. *Ben-Sholom v. Ayers*, 566 F. Supp. 2d 1053, 1147 (E.D. Cal. 2008). The government does not appeal this decision. Ben-Sholom, however, appeals the denial of his request for an evidentiary hearing on his claim of ineffective assistance of counsel during the guilt phase of his bifurcated trial.[2] Because the government does not argue that Ben-Sholom's trial counsel was effective, the question shifts to prejudice. We conclude that the district court did not err in declining to order an evidentiary hearing because Ben-Sholom cannot establish prejudice from counsel's ineffective performance. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Ben-Sholom's history lays the groundwork for his participation in the murder as well as his mental health challenge to the conviction. The facts are largely undisputed.

Ben-Sholom's childhood was difficult. When Ben-Sholom was seven years old, his father became part of his daily life. Over time, his father destroyed his prized possessions, set up mandatory "inspections" within the house, and beat him regularly. Ben-Sholom also suffered from chronic bad health, caused by stress and various injuries, both self-inflicted and inflicted by his father and classmates.

---

[2]On appeal, Ben-Sholom also claims that California's 1978 death penalty statute fails to adequately narrow the class of death penalty-eligible defendants. In Ben-Sholom's reply brief, as well as during oral argument, counsel acknowledged that this issue is not ripe for review as Ben-Sholom is not currently subject to a death sentence and has yet to be re-sentenced. Because resolution of this issue is premature, we decline to reach it. *See Richmond v. Ricketts*, 774 F.2d 957, 960 (9th Cir. 1985) (noting that before resentencing, a challenge to the imposition of the death sentence may be barred as moot or unripe).

As a teenager, Ben-Sholom early enlisted in the military. At age seventeen, he began basic training. Five weeks later, Ben-Sholom was medically discharged due to a preexisting injury. He then drifted aimlessly between jobs and residences, and was eventually convicted of burglarizing his mother's home. In juvenile hall, Ben-Sholom met John Calhoun who introduced him to Chris Seaman in early 1985. Ben-Sholom's association with these two individuals would be his undoing.

At the time of the robbery-murder in late January 1985, Ben-Sholom—by then eighteen years old—perceived himself to be involved in a "military mission" with the goal of obtaining weapons that he and his companions would use to support the Karen National Liberation Army in Burma (now Myanmar). To obtain these weapons, they concocted a plan to burglarize Teague's home—a plan developed the night before and finalized at a pizza parlor just hours before its execution. Ben-Sholom claims he was acting as the "point-man" for the mission and took orders, including the order to kill Teague, from Seaman and Calhoun.

Just before the burglary, Seaman, who stayed outside the house during the burglary, gave Ben-Sholom a gun to carry out the burglary. It was apparently understood by "general consensus" that there should be no witnesses to the burglary. When they unexpectedly found Teague at home, Ben-Sholom kept Teague on the floor while Calhoun gathered the weapons. Calhoun then moved an index finger across his throat, which Ben-Sholom interpreted as an order to eliminate Teague. After he shot Teague multiple times, Ben-Sholom, along with Calhoun, removed the confiscated guns from Teague's home. The trio then attempted to flee to Mexico, but were arrested the next day.

The same night as his arrest, Ben-Sholom confessed to participating in the robbery-murder. The confession, which included a vivid description of the four shots he fired into the base of Teague's skull, was a key piece of evidence against

Ben-Sholom at trial. When bluntly asked: "You realize you executed that lady during the commission of a robbery?" Ben-Sholom responded "Yeah." He also confirmed that he had participated in the planning of the robbery.

A few days later, investigators interviewed Ben-Sholom again and received a second confession. During that confession, Ben-Sholom expressed remorse, stating that his actions were "beginning to bother [him] really bad." When asked what he would do if he could do it all over again, he said he would not even commit the theft because "nothing is worth a person's life."

In preparation for trial, Ben-Sholom was assessed by seven doctors, five of whom focused on his mental state at the time of the crime. Three doctors are key to this appeal—two who saw Ben-Sholom before trial and a third who was offered by federal habeas counsel.

Dr. James Richmond was the first doctor to evaluate Ben-Sholom; that evaluation took place five days after the crime. Dr. Richmond was hired by the prosecution to determine whether Ben-Sholom would be able to mount an insanity defense at trial. As evidenced by his notes and deposition transcript, Dr. Richmond concluded that at the time of the crime, Ben-Sholom "was operating rationally, that he was able to see and understand and make decisions based on what was really happening around him."

In response, Dr. Rienzi conducted a mental health evaluation at the request of defense counsel. Dr. Rienzi was not provided any materials by defense counsel in advance of the evaluation and was not called as a witness at trial. She administered six psychological tests and concluded that Ben Sholom's "childhood defense system that allowed him not to see or feel his own pain, allowed him to act without awareness of the victim." Neither Dr. Rienzi's findings, opinions, or conclusions, nor the opinions of any other mental health experts

were presented to the jury, although there is evidence that defense counsel made a tactical decision not to pursue this evidence. In fact, Ben-Sholom's counsel did not mount any defense during the guilt phase and Ben-Sholom was convicted of all charges: murdering and robbing Silva Teague, Cal. Penal Code §§ 187, 211; and burglarizing her residence, *id.* § 459. The jury also found true special circumstance allegations of felony-murder robbery and felony-murder burglary, *id.* § 190.2(a)(17)(I), (vii) (1985), and sentenced Ben-Sholom to death. The convictions and sentence were affirmed on direct appeal, and all state habeas petitions were denied.

The California Supreme Court summarily denied Ben-Sholom's guilt phase ineffectiveness habeas petition "on the substantive ground that it is without merit." Separately and independently, the court also denied the guilt phase ineffective assistance claim because "it was not presented within a reasonable time after its legal and factual bases were, or should have been, discovered." In the federal habeas action, the parties and the district court proceeded to the merits. The court held a multi-day evidentiary hearing that focused on counsel's performance during the penalty phase of the trial, although the testimony included testimony from mental health experts, including Dr. Rienzi.

Ben-Sholom's federal habeas counsel also hired Dr. Gary Wynbrandt to provide a retrospective assessment of Ben-Sholom's mental state in 1985. Dr. Wynbrandt reviewed the reports and notes of the previous mental health experts who had evaluated Ben-Sholom, as well as test results, police reports, and social history materials. He listened to the tape of the confessions and personally evaluated Ben-Sholom. His report diagnoses Ben-Sholom with severe post-traumatic stress disorder, which began at age seven when Ben-Sholom's father entered Ben-Sholom's life. Dr. Wynbrandt also diagnosed Ben-Sholom with identity fragmentation and dissociative disorder, gender-preference dysphoria, and episodes of major depression. He testified that at the time of the crime,

Ben-Sholom was acting under the substantial domination of Seaman and Calhoun, and that the above diagnoses should have been apparent to any well-informed psychiatrist at the time of Ben-Sholom's trial. In 1997, when Ben-Sholom's federal habeas petition was pending, Dr. Rienzi declared that Ben-Sholom suffered from depression, dysthymic disorder, and post-traumatic stress disorder.

The district court declined the request for an evidentiary hearing on the ineffectiveness of counsel during the guilt phase, reasoning that Ben-Sholom "does not identify a viable guilt phase strategy that could have been presented had [defense counsel] pursued the omitted mental health evidence." This appeal focuses on that determination.

## ANALYSIS

Habeas relief may be granted "only on the ground that [Ben-Sholom] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1994).[3] Ben-Sholom bears the burden of demonstrating a violation by a preponderance of the evidence. *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002). An evidentiary hearing is required where Ben-Sholom's "allegations, if proved, would establish the right to relief." *Id.* at 833 (quotation marks omitted).

We review de novo both the district court's decision to deny habeas relief, *McNab v. Kok*, 170 F.3d 1246, 1247 (9th Cir. 1999), and the state court's legal determination regarding the claim of ineffective assistance of counsel, *Silva*, 279 F.3d at 835. *See also James v. Gibson*, 211 F.3d 543, 550 (10th

---

[3]Ben-Sholom's first substantive pleading seeking federal habeas relief was filed in October 1995. Because his filing was prior to the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), pre-AEDPA 28 U.S.C. § 2254 controls. *Dubria v. Smith*, 224 F.3d 995, 1000 n.1 (9th Cir. 2000) (en banc).

Cir. 2000) (under pre-AEDPA law, the court of appeals reviews federal legal issues de novo).

The two-pronged analysis for ineffective assistance of counsel claims is well-established: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Ben-Sholom's request for an evidentiary hearing to develop his ineffective assistance of counsel claim rises and falls on his argument for relief under *Strickland*.

**[1]** Because the government does not dispute Ben-Sholom's claim that his counsel performed deficiently during the guilt phase of his trial, we focus here solely on the second prong of *Strickland*—whether Ben-Sholom was prejudiced by counsel's deficient performance. 466 U.S. at 687. To demonstrate that he was prejudiced, Ben-Sholom must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This standard hobbles Ben-Sholom's arguments. In light of California law, the psychological evidence, which is hardly overwhelming, and the confessions, we conclude that the result would not have been different.

**[2]** Ben-Sholom claims that his counsel's failure to investigate, prepare, and present readily available evidence related to Ben-Sholom's mental state was prejudicial. Specifically, Ben-Sholom argues that the declarations of Dr. Wynbrandt and Dr. Rienzi leave no doubt that Ben-Sholom could not (and indeed did not) form the mental state necessary to commit the felonies for which he was convicted. He further claims that if this or similar testimony had been presented at trial and believed by one or more jurors, the government could not have proved that he was capable of forming the requisite mental state.

Rather, the mental state evidence would show that Ben-Sholom was acting as an automaton and therefore incapable of forming the intent to commit robbery and burglary, the felonies underlying the felony-murder conviction.

Under California law, evidence of "mental disease, mental defect, or mental disorder" cannot be used to show or negate capacity to form intent but rather only to show "whether or not the accused actually formed a required specific intent . . . ." Cal. Penal Code § 28(a). Under this benchmark, the trier of fact makes the determination, *id.* § 29, and experts may not offer opinions on the ultimate issue.

Ben-Sholom claims that the failure to present evidence by Drs. Wynbrandt and Rienzi was prejudicial, because if one or more jurors believed that evidence, he could not have been convicted of felony-murder. Addressing Ben-Sholom's argument, we turn first to the psychiatric evidence.

In his report Dr. Wynbrandt described Ben-Sholom as an automaton with no independent free will. Dr. Wynbrandt found:

> The evidence at trial . . . established that [Ben-Sholom] was acting under the direction of Christopher Seaman and John Calhoun from the time they arrived at the victim's residence until they left, and that [Ben-Sholom] believed he was the bottom rung of a hierarchically organized "mission" . . . . Seaman's instigation of the [plot and his orders to Ben-Sholom] strongly suggest a substantially dominant role vis a vis [Ben-Sholom] during the crime. As [Ben-Sholom] put it, "without Seaman, nothing would have happened."

Based on these facts, Dr. Wynbrandt concluded that Ben-Sholom's "mental disorders would have substantially impaired or eliminated his capacity to independently form any

specific intent to unlawfully rob or kill." Ben-Sholom "had effectively become an automaton in the context of this mission. He was not capable of refusing to follow any order; the applicable 'law' in his mind was that he was bound to obey the directives of he who was in command. His only focus, and whole morality, was centered on whether he carried out the order in a proper manner."

Dr. Wynbrandt's testimony, apart from his effort to opine on the ultimate issue, skirts the real question—actual intent to commit burglary and robbery—and is not linked to the facts here. The report, also, does not align with the evidence elsewhere in the record. Particularly, the notion of an "on high" command is not consistent with the great weight of the evidence. Nothing supports a claim that Ben-Sholom was *ordered* to partake in the burglary. To the contrary, Ben-Sholom confessed that the night before the robbery-murder, the three participants hatched a plan to burglarize Teague's home. There were no orders from on high—a poorly-thought-out joint decision carried them forward to the burglary and the robbery.

**[3]** Similarly, Dr. Rienzi's declaration, even when taken in conjunction with the report provided by Dr. Wynbrandt, fails to show that the introduction of mental health evidence would have altered the outcome. Like Dr. Wynbrandt, she premised her conclusions on Ben-Sholom's role as the "point man" of the mission. She stated that for Ben-Sholom, it was "necessary to obey orders: that under all circumstances and in any context, it was always right to follow orders and wrong to disobey them. A corollary to this principle was that in a fight for a higher good, particularly a war, some people have to be eliminated." Again, the evidence does not support a claim that Ben-Sholom burglarized Teague's home because of an order from either Seaman or Calhoun, or that he was incapable of making his own decisions.

**[4]** As to Ben-Sholom's participation in the planning of the burglary, Dr. Rienzi stated that Ben-Sholom could not have

designed the scheme himself. But Ben-Sholom's liability does not depend on his status as the prime mover in this escapade; he is still liable if he had the intent to commit the burglary and robbery. As to that point, Dr. Rienzi concluded:

> At the time of this crime, [Ben-Sholom] was operating as a tool in the most literally mechanical sense of the word. . . . Under these circumstances, [Ben-Sholom] could not have formed and did not form an independent intent to take Mrs. Teague's property, or to kill her. Whatever the intentions were of his "superiors," [Ben-Sholom] was programmed by his life with [his father] to perform as they directed him.

This gloss on the facts and assertion of dominion and control are contradicted by the record. As Ben-Sholom admitted, the scheme to burglarize Teague's home was finalized by all three of the participants the night before it was carried out. Ben-Sholom arrived at the crime scene independently of Seaman and Calhoun, of his own free will. Dr. Rienzi, like Dr. Wynbrandt, does not address why Ben-Sholom's admitted intention to burglarize Teague's home, which was formed and agreed to the night before the murder, was not a product of Ben-Sholom's own free will.

[5] Even if the doctors' reports suggest that Seaman and Calhoun had some degree of dominion and control over Ben-Sholom, to obtain relief, the testimony must "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In making the prejudice determination, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695. Consideration of the remainder of the evidence—namely, the confessions—regarding Ben-Sholom's state of mind underscores the lack of prejudice. *Id.* at 696 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

**[6]** Both of Ben-Sholom's taped confessions were played for the jury. Sergeant Gary Harris testified that during the second confession, Ben-Sholom "actually there in the office, stood up in front of us and more or less in his words reenacted exactly how it happened. He pretended as if Mrs. Teague was lying in this position. He actually stood over her, simulated he was holding a rifle, and as he was talking on the tape, and showed us how he positioned it, and why he positioned it that way." He fired four or five shots "[t]o make sure." And Ben-Sholom then detailed that he killed her in a very specific way that he had learned from "private training." He was not under the influence of any drugs or alcohol nor did he have any delusions about what he was doing. Ben-Sholom also admitted that he would not commit the burglary if he had to do it all over again.

During his first police interview, the day after the murder, Ben-Sholom admitted he was present at the pizza parlor where the three co-conspirators decided to "go in and remove weapons from the house." Ben-Sholom laid out the strategy for the plan to obtain weapons to use in Burma. They intended to join the Karen National Liberation Army once he got the weapons. Then, at the time of the robbery, Ben-Sholom forced his way into the house despite Teague's efforts to shut the door. He further admitted that Teague was not supposed to be home, and that he regretted "doing something that cause[d him] to be permanent[ly] diverted from getting to Mandalay."

During his second interview three days later, Ben-Sholom admitted that the plan to burglarize Teague's home was first discussed and agreed upon the night before the murder. The group went by the house before the robbery. When asked who "decided" or "actually verbalized" that they would kill any witnesses, Ben-Sholom said "[i]t was really kind of a general consensus." All three of them "more or less knew that." After the murder, he and Calhoun gathered up weapons, leaving those that were perceived as being of little use in the jungle,

for example the single shot .22 and air rifles. Ben-Sholom clarified that "more than anything we couldn't believe that we had actually done what we did. All we were trying to do at that point was cover our ass, get the hell out of the country."

**[7]** Considered as a whole, these statements plainly demonstrate that Ben-Sholom intended to, and did, enter Teague's home with the purpose of taking weapons. Indeed, not only did Ben-Sholom later acknowledge that he had broken the law, he even expressed remorse for his actions. He lucidly articulated his own premeditated motive for committing both the burglary and robbery and his endorsement of the plan jointly conceived with his cohort.

**[8]** The district court's summary of the evidence is worth quoting to emphasize that Ben-Sholom knew what he was doing, despite the bizarre scheme:

> Ben-Sholom's undeniably traumatic upbringing, even coupled with the truly profound disappointments he endured and his medically prescribed ingestion of Inderal, do not and cannot explain away his voluntary involvement in a scheme, misguided though it may have been, to obtain weapons in order to fulfill an elusive goal of becoming a paramilitary freedom fighter. Though Ben-Sholom may have been tormented by his lack of identity and his motive for killing truly was irrational, his conduct, nevertheless, was measured and determined. As Ben-Sholom characterizes the custodial statements in his moving arguments, they were "the prosecution's strongest evidence." While they clearly convey the notion that he perceived the burglary plan as a "military mission" in which he was "soldier" of low rank obliged to follow orders, they also demonstrate that he made a decision to participate in the plan in order to further his goal of joining the Kar[e]n National Liberation Army. Nothing presented in Ben-Sholom's offer

of proof convincingly demonstrates that he was not legally responsible for his actions on January 23, 1985. The absence of any statement by Dr. Glenn in his most recent declaration as to Ben-Sholom's criminal responsibility, in particular, is a telling omission. While the doctor reiterates the complaint that Mr. Alexander failed to provide background information specifically requested, he does not indicate he has at any time since Ben-Sholom's sentence reviewed that information or what his opinion might be now that he has reviewed it. This gap in logical argumentation suggests either that Ben-Sholom has never provided Dr. Glenn with the previously omitted, but now available, information, or that Dr. Glenn has reviewed it, but still hasn't arrived at a conclusion as to what the best mental defense at the guilt proceedings would have been. When the evidence adduced during trial overwhelmingly shows that a defendant is guilty of the underlying offense, as is the case here, counsel's chosen strategy cannot be successfully assailed. With respect to Mr. Alexander's guilt phase representation, Ben-Sholom's offer of proof and argument have not shown there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, with a reasonable probability defined as probability sufficient to undermine confidence in the outcome."

**[9]** The psychiatric evidence submitted by Ben-Sholom does not establish a right to relief nor does it mitigate the overwhelming evidence that Ben-Sholom knew exactly what he was doing when he entered Teague's house to steal the weapons.

**[10]** Reviewing the entirety of the record leads to the unescapable conclusion that Ben-Sholom intended to commit burglary by entering the house to take the weapons, and he

intended to commit robbery when he took weapons by force from Teague's home. In light of the evidence before the jury, including the two unequivocal confessions, Ben-Sholom's proffered evidence does not undermine confidence in the jury's finding of guilt. *Strickland*, 466 U.S. at 694-95. Ben-Sholom was not prejudiced by his attorney's failure to present a mental state defense during the guilt phase. The district court properly denied Ben-Sholom's request for an evidentiary hearing.[4]

**AFFIRMED.**

---

[4]Ben-Sholom also raises three uncertified issues. A certificate of appealability should issue if reasonable jurists could debate whether the issue should have been resolved in a different manner or is adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Ben-Sholom presents no such issues.