**Demetrie Ladon MAYFIELD,
Petitioner–Appellant,**

v.

**Jeanne WOODFORD, Warden,
Respondent–Appellee.**

No. 97–99031.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 19, 2001.

Filed Nov. 7, 2001.

Michael M. Crain, Klein & Crain, Santa Monica, California, and Michael T. Shannon, Pasadena, California, for the petitioner-appellant.

Garrett Beaumont, Deputy Attorney General, San Diego, California, for the respondent-appellee.

Before: SCHROEDER, Chief Judge, and O'SCANNLAIN, RYMER, KLEINFELD, HAWKINS, SILVERMAN, GRABER, GOULD, BERZON, TALLMAN, and RAWLINSON, Circuit Judges.

RICHARD C. TALLMAN, Circuit Judge:

Demetrie Ladon Mayfield murdered Ora Mae Pope on February 2, 1983, to exact revenge from Ms. Pope and her son, Byron, who had sworn out a complaint against Mayfield for auto theft. He then killed John Moreno to eliminate the only eyewitness to the crime. A San Bernardino County jury convicted Mayfield of two counts of first degree murder and found a multiple murder special circumstance to be true. After a separate penalty hearing,

the jury recommended that Mayfield be put to death.

Every court that has reviewed this case has upheld the conviction and sentence. The California Supreme Court affirmed Mayfield's death sentence on direct appeal and, after referring several questions to a superior court judge who served as a referee at an extensive evidentiary hearing, it denied Mayfield's state habeas corpus petition. *People v. Mayfield*, 5 Cal.4th 142, 19 Cal.Rptr.2d 836, 852 P.2d 331 (1993). The United States Supreme Court denied *certiorari*. *Mayfield v. California*, 512 U.S. 1253, 114 S.Ct. 2780, 129 L.Ed.2d 892 (1994). Mayfield then filed a federal habeas corpus petition in the United States District Court for the Central District of California. The district court denied Mayfield's petition, and a three-judge panel of this Court affirmed. *Mayfield v. Calderon*, 229 F.3d 895 (9th Cir.2000).

We voted to reconsider en banc the claims raised by Mayfield in his federal habeas corpus petition. Mayfield raises seven claims, but ineffective assistance of counsel at the guilt and penalty phases are the predominant ones. He claims that the jury instructions improperly prevented the jury from considering (1) sympathy for Mayfield, (2) the consequences of their verdict, and (3) mitigating evidence not related to the crime. He also asserts that (4) the 1978 California death penalty statute under which he was convicted and sentenced is unconstitutional. Finally, he alleges that his attorney provided ineffective assistance (5) due to conflicts of interest arising out of racial prejudice and concern for reputation, (6) at the guilt phase, and (7) at the penalty phase. With regard

to each claim, we must determine whether to grant a certificate of appealability ("COA"). If we grant COAs for any of Mayfield's claims, we must then address the merits of those claims.

We deny COAs as to claims one through five. We grant COAs as to claims six and seven, alleging ineffective assistance of counsel at the guilt and penalty phases of trial. We agree with the courts that have already reviewed this case that, regardless of whether the performance of Mayfield's counsel at the guilt phase was deficient, Mayfield suffered no prejudice at the guilt phase. Accordingly, we affirm the district court's denial of Mayfield's claim for ineffective assistance at the guilt phase and leave undisturbed the jury's verdict convicting Mayfield of two counts of first degree murder with special circumstances.

We disagree, however, with those courts' determinations that Mayfield received effective assistance of counsel at the penalty phase. We hold that the performance of Mayfield's counsel at the penalty phase was deficient and that Mayfield suffered prejudice as a result. We reverse the district court's denial of Mayfield's claim for ineffective assistance at the penalty phase and remand to the district court to grant Mayfield's habeas corpus petition on this ground. The state court shall conduct a new sentencing proceeding to determine whether Mayfield is to be sentenced to death or to life without parole.

**I**

To understand the events surrounding Mayfield's crime and punishment, we provide an overview of the events which led to the murders in 1983.[1]

---

1. We set forth throughout this opinion the evidence presented at trial and at the state habeas corpus evidentiary reference hearing because the United States Supreme Court has said that, in reviewing ineffective assistance

of counsel claims, we must "evaluate the totality of the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding-in reweighing it against the evidence in aggravation."

Demetrie Mayfield lived with Robert Wafer next door to the Pope family in the San Bernardino housing projects during much of 1982. He borrowed Wafer's 1968 Pontiac so frequently that he had his own key. Wafer left town, abandoning his house and car.

In December 1982, the car was repossessed because of delinquent payments. Ora Mae Pope arranged to take over the payments and to purchase the car for her son, Byron. Byron was in possession of the car for only three days before it disappeared from the Popes' driveway. Byron reported the car stolen.

Mayfield and two of his friends were arrested in the car a day later. Mayfield pled guilty to one count of unlawful taking of a vehicle and was released pending a sentencing hearing. He was told that he would be sentenced to one year in jail. He did not appear for his sentencing hearing on the scheduled date.

On the evening of February 2, 1983, Mayfield was at Pat Harper's house, less than a block from the Pope residence. He had stayed with Harper sporadically since his mother had ordered him out of her house. About 11:00 p.m. he walked over to the Pope residence. He stood outside the living room window, where he overheard Ms. Pope and John Moreno talking about him. He returned to Harper's house and told her that he did not like what they were saying about him and that "he was going to show them."

Mayfield armed himself with a .12–gauge, sawed-off, single-shot shotgun,[2] and two shotgun shells, and went back to the Pope residence. Using a screw driver he also carried from Harper's house, he removed a screen window from the back of the Pope residence, climbed into the house, and loaded the first shell into the shotgun. He crept down the hall and turned into a small living room, confronting Ms. Pope and Moreno, who were sitting on the couch drinking, smoking, and talking. Mayfield sat on the arm of another couch, approximately five feet from Ms. Pope, with the shotgun leveled at her.

During a fifteen- to twenty-minute verbal confrontation regarding the auto theft charges, Mayfield kept his finger resting on the trigger. According to his audio-taped confession and videotaped re-enactment of the crime, Mayfield claimed that Ms. Pope suddenly stood up from the couch to light a cigarette. Mayfield insisted he "thought she was coming at [him]" and jerked back reflexively, accidentally pulling the shotgun's "hair" trigger[3] and shooting her. Mayfield broke open and re-loaded the shotgun. He then shot Moreno because he had witnessed the crime.

Mayfield retrieved the spent shotgun shells from the floor, took the keys to the Pope residence from a table in the back hall, locked the back door, and returned to Harper's house. He told Harper, "I did it. I didn't mean to. It slipped. It was an accident. And then I had to do the second one." He concealed the shotgun in a torn

*Williams v. Taylor*, 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

2. A single-shot shotgun holds only one round. After firing it, the shooter must break open the weapon, ejecting the spent cartridge. He must then manually load the next round, close the weapon, and cock the hammer before it is ready to fire again.

3. A "hair" trigger requires very little pull of the finger to drop the hammer. Subsequent tests showed that up to seven pounds were required to pull the trigger of the murder weapon. The firearms expert testified at the evidentiary hearing that a "normal" pull would have been about four pounds. He described the trigger pull on Mayfield's weapon as "heavy."

couch cushion in a storage room off the side of her house. Then he returned to the Pope residence.

Mayfield replaced the screen window. He dragged the bodies of Ms. Pope and Moreno from the living room, out the back door, across a short cement walk, and into a storage closet accessible from outside. He used a garden hose to wash their blood from the walk. After retrieving a kitchen knife, which he wrapped hidden in a towel, Mayfield locked the door and waited outside for Byron to come home.

When Byron arrived, Mayfield confronted him, and the two wrestled.[4] Mayfield refused to let Byron into his house. He demanded to know why Byron and his mother had pressed charges against him for the car theft and why Byron had been bad-mouthing him around the neighborhood. A mutual friend drove by during the confrontation and stopped to intercede. The friend suggested that Byron simply drop the charges, but Mayfield said it was too late for that. At an impasse and unable to get into his house, Byron and his friend left. Mayfield went to his mother's home, where he slept in the garage.

The police arrested him there the next morning. After providing blood and urine samples at the hospital, Mayfield was taken to the San Bernardino police station for questioning. After administering *Miranda* warnings and obtaining a waiver of his constitutional rights, two detectives interviewed Mayfield on audiotape. Mayfield initially denied any knowledge of, or involvement in, the crime. When confronted with the evidence that police had already gathered against him, Mayfield confessed. Following his confession, Mayfield explained the circumstances of his crime in detail.

After the audiotaped interview, the police asked Mayfield to participate in a videotaped re-enactment of the crime. He agreed. The video shows Mayfield at the crime scene the following day, clad in orange jail coveralls, approaching the house with the shotgun, removing the screen window, confronting Ms. Pope and Moreno (played by plain-clothes police officers), pretending to shoot them, positioning them face down on the sofa, pretending to drag them out the door and across the walk, and placing them atop one another in the storage closet.

On February 10, 1983, Donald S. Ames was appointed to represent Mayfield. After a three-day trial (exclusive of jury selection), the jury deliberated for two and one-half hours before convicting Mayfield of two counts of murder in the first degree with the special circumstance of committing multiple murders. A separate penalty hearing commenced three days later and, after a day and a half, the jury recommended that Mayfield be sentenced to death.

## II

Mayfield's appeal of the district court's dismissal of his federal habeas corpus petition, initiated after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–122, 100 Stat. 1214 ("AEDPA"), is governed by the COA requirements codified at 28 U.S.C. § 2253.[5] We cannot re-

---

**4.** Byron testified that Mayfield did not appear to be under the influence of drugs, although he did smell alcohol on Mayfield's breath.

**5.** We note, however, that even though AEDPA's provisions apply to the issue of whether Mayfield is entitled to a COA, pre-AEDPA law

applies to the merits of the habeas petition because Mayfield filed his petition in district court on June 21, 1995, before AEDPA's effective date of April 24, 1996. *See Slack v. McDaniel*, 529 U.S. 473, 481–82, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *Lindh v. Mur-*

view the merits of Mayfield's claims unless we first determine with regard to each claim that Mayfield has made "a substantial showing of the denial of a constitutional right" justifying issuance of a COA. 28 U.S.C. § 2253(c) (2000); *see also Petrocelli v. Angelone,* 248 F.3d 877, 883 (9th Cir. 2001) ("[E]ach issue sought to be appealed under AEDPA must be ruled on separately ... on the request for a COA."); *Morris v. Woodford,* 229 F.3d 775, 779 (9th Cir.2000) ("Unlike a [Certificate of Probable Cause], which allows a party to appeal an entire petition, a COA is granted on an issue-by-issue basis."), *cert. denied,* —— U.S. ——, 121 S.Ct. 2238, 150 L.Ed.2d 227 (2001).

■ The Supreme Court set forth the standard for issuance of a COA in *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Where, as here, the district court denies a habeas corpus petition on the merits, rather than on procedural grounds, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484, 120 S.Ct. 1595. "[T]he nature of the penalty is a proper consideration in determining whether to issue a certificate of [appealability]." *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); *Slack,* 529 U.S. at 483, 120 S.Ct. 1595 ("Except for substituting the word 'constitutional' for the word 'federal,' § 2253 is a codification of the CPC standard announced in *Barefoot* ..."). Accordingly, we resolve any doubt regarding whether to issue a COA in favor of Mayfield. *See Petrocelli,* 248 F.3d at 884;

*Lambright v. Stewart,* 220 F.3d 1022, 1025 (9th Cir.2000).

■ Pre–AEDPA standards of review govern our consideration on the merits because Mayfield filed his habeas corpus petition prior to AEDPA's effective date. *Dubria v. Smith,* 224 F.3d 995, 1000 n. 1 (9th Cir.2000) (en banc), *cert. denied,* 531 U.S. 1148, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001); *see also Slack,* 529 U.S. at 481, 120 S.Ct. 1595 (noting that the date the habeas corpus petition was filed determines whether the pre-AEDPA or post-AEDPA version of § 2254 applies). We presume that the state court's findings of historical fact are correct and defer to those findings "in the absence of 'convincing evidence' to the contrary" or a demonstrated lack of "fair support in the record." 28 U.S.C. § 2254(d) (1994); *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). We review mixed questions of law and fact, such as whether Mayfield received ineffective assistance of counsel, de novo. *Dubria,* 224 F.3d at 1000. Finally, we review pure questions of law de novo. *Schiro v. Farley,* 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994).

## A

Mayfield argues that by instructing the jury during the penalty phase to consider such guilt phase instructions as it found applicable, the judge created a risk that the jury would apply to its penalty phase deliberations the guilt phase instruction that the jury "not be swayed by ... sympathy." [6] The risk was exacerbated, he claims, by the prosecutor's penalty phase

---

*phy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

**6.** We discourage courts in future cases from placing the burden on the jury to determine which guilt phase instructions apply at the

penalty phase and encourage trial judges, instead, to provide the jury at the penalty phase with a complete set of instructions, repeating those instructions from the guilt phase that may be applicable to the penalty phase.

closing argument that the jury should not determine Mayfield's penalty "based on any sympathies ... either for defendant or against him." He urges that the guilt and penalty phase instructions, combined with the prosecutor's argument, violated the Eighth and Fourteenth Amendments by preventing the jury from considering sympathy for Mayfield in determining his sentence.

■ The Supreme Court has admonished that state jury instructions must be upheld against constitutional attack unless "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). At the penalty phase of a capital trial, this directive requires that "the sentencer ... be able to consider and give effect to mitigating evidence in imposing the sentence, so that the sentence imposed reflects a reasoned moral response to the defendant's background, character, and crime." *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 1916, 150 L.Ed.2d 9 (2001) (quotations and citations omitted).

■ Applying these standards, federal courts have consistently held that jury instructions admonishing the jury to base its penalty determination on mitigating or aggravating evidence, not on sympathy for the defendant, pass constitutional muster. *See, e.g., Victor v. Nebraska,* 511 U.S. 1, 13, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (holding that an instruction not to be swayed by mere sympathy correctly pointed the jurors' attention to the evidence before them); *Johnson v. Texas,* 509 U.S. 350, 371–72, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (holding that the constitution does not require that a capital jury be able to dispense mercy solely on the basis of a "sympathetic response to the defendant");

*California v. Brown,* 479 U.S. 538, 542–43, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (permitting an instruction that the jury could not base its sentencing decision on sympathy); *Williams v. Calderon,* 52 F.3d 1465, 1481 (9th Cir.1995) (observing that " 'no sympathy' instructions have been held by the Supreme Court to be consistent with its mandate ... that the sentencer be permitted to consider all mitigating evidence") (citations omitted). In light of this precedent, no reasonable jurist could debate or find wrong the district court's denial of Mayfield's request for habeas corpus relief on this claim. We decline to grant a COA with regard to this issue.

### B

■ Mayfield argues that by instructing the jury during the penalty phase to consider such guilt phase instructions as it found applicable, the judge created a risk that the jury would apply to its penalty phase deliberations the guilt phase instruction to reach "a just verdict regardless of what the consequences may be." We judge the challenged instruction "not ... in artificial isolation, but ... in the context of the overall charge." *Boyde,* 494 U.S. at 378, 110 S.Ct. 1190.

The jury was specifically instructed at the penalty phase that it was to reach its decision "guided by the applicable factors of aggravating and mitigating circumstances upon which [it had] been instructed." The jury was instructed with regard to seven such aggravating or mitigating factors and told that it should also consider "[a]ny other circumstance which extenuates the gravity of the crime." Finally, the jury was instructed that its objective in weighing the aggravating and mitigating circumstances was to determine whether Mayfield was to be sentenced to death or to life without parole.

Viewing these instructions as a whole, it is evident that the jury was fully apprised of the consequences of its deliberations and that a reasonable juror would have construed the instructions as requiring him or her to consider all relevant mitigating evidence. *Boyde*, 494 U.S. at 378, 110 S.Ct. 1190. Because no reasonable jurist could debate or find wrong the district court's denial of Mayfield's request for habeas corpus relief on this claim, we decline to grant a COA on this issue.

### C

■■■ Mayfield argues that, by instructing the jury to consider, in addition to seven defined aggravating or mitigating factors, "[a]ny other circumstance[ ] which extenuates the gravity of the crime even though it is not a legal excuse for the crime," CALJIC 8.84.1(k), the judge prevented the jury from considering mitigating facts not associated with the crime itself, but associated instead with Mayfield's background and character. The Supreme Court squarely rejected this argument in *Boyde*, holding that "there [was] not a reasonable likelihood that the jurors ... understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by petitioner." 494 U.S. at 386, 110 S.Ct. 1190. We therefore decline to grant a COA on this claim.

### D

Mayfield argues that California's death penalty scheme is unconstitutional because it does not adequately narrow the class of persons eligible for the death penalty. The 1978 death penalty statute pursuant to which Mayfield was convicted and sentenced narrows the class of persons eligible for the death penalty at both the guilt and the penalty phases.

■■■ A defendant is eligible for the death penalty under the 1978 statute only if, at the guilt phase, the jury finds him guilty of first degree murder and finds to be true a statutorily defined special circumstance. *See Jurek v. Texas*, 428 U.S. 262, 270–71, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding capital punishment statute that required the jury to find at the guilt phase that the defendant's crime fell within one of five statutory categories of death-eligible murder). At the penalty phase, the class of defendants eligible for death is again narrowed by the jury's application of a series of statutorily enumerated aggravating or mitigating factors. *See Blystone v. Pennsylvania*, 494 U.S. 299, 307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (holding statute sufficiently narrows the class of death-eligible defendants to survive constitutional scrutiny if it "allow[s] the jury to consider all relevant mitigating evidence"); *Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (holding that a capital punishment statute is constitutional if it "broadly define[s] capital offenses and provide[s] for narrowing by jury findings of aggravating circumstances at the penalty phase"). A reasonable jurist could not debate, therefore, that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional. We decline to grant a COA on this claim.

### E

Mayfield argues that Ames' racism and his concern that he not be perceived by the San Bernardino bar or bench as requesting too much funding prevented Ames from effectively representing Mayfield. Mayfield submitted in support of his federal habeas corpus petition six declarations indicating that Ames was racially prejudiced. Two of the declarations related racial epithets that Ames used in reference

to minority clients.[7] None of the declarations alleged that Ames used racial epithets to describe Mayfield or that Ames' alleged prejudice affected his representation of Mayfield.[8]

■ In order to establish ineffective assistance resulting from a conflict of interest, Mayfield must show "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir.1994). It is by no means clear from precedent that the grounds for conflict alleged by Mayfield are cognizable under ineffective assistance case law.[9] Even assuming that they are, Mayfield has not demonstrated that Ames performed poorly *because of* the alleged conflicts. Accordingly, we decline to grant a COA on Mayfield's claim that Ames' alleged conflicts of interest caused him to provide ineffective assistance of counsel.

## F

■ To prevail on a claim of ineffective assistance at either the guilt or the penalty phase, Mayfield must demonstrate two components. "First, [he] must show that counsel's performance was deficient.... Second, [he] must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. We hold that reasonable jurists could debate the district court's assessment of Mayfield's claim for ineffective assistance of counsel at the guilt phase. Accordingly, we grant a COA on this claim and address the merits.

■ Under *Strickland*, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." 466 U.S. at 697, 104 S.Ct. 2052. We heed the Court's advice and, without resolving the question whether Ames' performance at the guilt phase was deficient, affirm Mayfield's conviction of two counts of first degree murder with special circumstances because Mayfield suffered no prejudice as a result of the alleged deficiencies.

To demonstrate that he suffered prejudice as a result of Ames' allegedly deficient performance, Mayfield must show that the probability that counsel's deficient performance altered the outcome is "sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.[10] In light of the

---

7. We overturned the death penalty of one such client, Melvin Wade, because we held *on grounds unrelated to racial prejudice* that Ames' representation of Wade was ineffective. *See Wade v. Calderon*, 29 F.3d 1312, 1323–35 (9th Cir.1994), *cert. denied*, 513 U.S. 1120, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995).

8. The declarations, originally submitted in *Wade* in 1991, were not before the state evidentiary referee, who conducted proceedings in 1989. Accordingly, we do not have the benefit of state court findings of fact regarding Ames' alleged racism.

9. Federal courts have found a conflict of interest sufficient to support a claim of ineffective assistance when counsel represents mul-

tiple defendants, either simultaneously or successively, *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. 1708; *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir.1989); represents or has represented a potential witness, *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir. 1988); maintains a personal pecuniary interest that conflicts with the interests of the client, *see United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir.1980); or accepts compensation from a third party for representing the defendant, *Quintero v. United States*, 33 F.3d 1133, 1135 (9th Cir.1994).

10. Mayfield does *not* have to show "that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. 2052.

strong inculpatory evidence presented by the State at trial, we find it unlikely that a competent performance by Ames would have altered the jury's verdict. The State presented the motive, the murder weapon, and a videotape on which Mayfield first admitted committing the crime and then reenacted it. The State also presented two witnesses who had told police that Mayfield told them that he was going to shoot Ms. Pope days before the crime (although both witnesses recanted their statements at trial). By the conclusion of the State's case-in-chief, there can have been no reasonable doubt in the jurors' minds that Mayfield was guilty of two first degree murders. This may well have been one of those cases that was virtually indefensible. The formidable task of presenting a credible defense was compounded by Mayfield's admission to his lawyer that he had gone to the Pope house that night intending to kill Ora Mae Pope.

We are confident that the evidence presented at the state evidentiary hearing would not have changed the jurors' minds. Although Mayfield told police he had not used PCP the night of the crime, several witnesses testified that Mayfield chronically abused alcohol and PCP and that he smoked sherm (marijuana laced with PCP) "almost on a daily basis" just prior to the crime. A toxicologist and an endocrinologist testified at the evidentiary hearing that, as a result of Mayfield's chronic PCP abuse and poorly regulated diabetes,[11] he may have been experiencing any of a range of conditions the night of the crime, including "reduced judgment" and "decreased impulse control," blurred vision, clumsiness, impaired thinking, nausea, and vomiting.

Mayfield also proved at the evidentiary hearing that when Ms. Pope drank she could become erratic and unpredictable. Byron Pope testified that if his mother had been drinking she might "cuss you out . . . waive her hands around; you know, get excited" and "she would probably strike you."

The strength of the State's evidence of premeditation, the relative dearth of evidence supporting the defense theory of accident, and the brevity of the jury's deliberations all indicate that Ames' allegedly deficient performance did not alter the jury's determination of guilt. The strength and unanimity of the jurors' belief in Mayfield's guilt is reflected by the fact that after a three-day trial the jury took scarcely more than two hours to find him guilty of both first degree murder charges and to find true the special circumstance. See *Murtishaw v. Woodford*, 255 F.3d 926, 974 (9th Cir.2001) (considering the length of jury deliberations as probative of whether improper jury instructions prejudiced the defense). Because Mayfield has not demonstrated that he was prejudiced by Ames' allegedly deficient performance at the guilt phase, we hold that the district court did not err by denying his claim for ineffective assistance of counsel at that phase.

### G

■ Mayfield's claim that he received ineffective assistance of counsel at the penalty phase is also governed by the *Strickland* standard. To prevail, Mayfield must show both that Ames' performance was deficient and that there is a reasonable probability that the jury would not have sentenced Mayfield to death if Ames had

---

11. The endocrinologist testified—based on Mayfield's post-arrest blood sugar level of 371—that Mayfield's blood sugar level was between 300 and 500 when he committed the crime. Normal blood sugar level is 80. However, he testified at the evidentiary hearing that Mayfield would still have been capable of forming the intent to kill.

performed effectively. *See Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. We hold that reasonable jurists could debate the district court's assessment of Mayfield's claim for ineffective assistance of counsel at the penalty phase. Accordingly, we grant a COA on this claim and address the merits.

### 1. Ames' Performance at the Penalty Phase

Ames' performance at the penalty phase was deficient if, measured against "prevailing professional norms," it "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. In making this determination, we must avoid the temptation to second-guess Ames' performance or to indulge "the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. 2052. Every intendment of competence is to be given to counsel. *Id.* We may find Ames' performance deficient only if, viewing the situation from his perspective at the time of trial, his decisions cannot be characterized as "sound trial strategy." *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to "present[ ] and explain[ ] the significance of all the available [mitigating] evidence." *Williams v. Taylor,* 529 U.S. 362, 393, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). We hold Ames' performance deficient because he neither adequately investigated and prepared for the penalty phase nor presented and explained the significance of all the available mitigating evidence to the jury.

In preparing to represent Mayfield at the penalty phase, Ames had an "obligation to conduct a thorough investigation of [Mayfield's] background." *Williams,* 529 U.S. at 396, 120 S.Ct. 1495. Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. The evidentiary referee found that it was "apparent ... that [Ames] never gave much thought to a penalty phase." Ames billed only 40 hours in preparation for both the guilt and penalty phases of trial.[12] Ames had only one substantive meeting with his client, the morning trial began, and did not discuss with him possible witnesses or trial strategies. He did not associate co-counsel to assist in Mayfield's defense although, under *Keenan v. Superior Court,* 180 Cal.Rptr. 489, 640 P.2d 108 (1982), Mayfield was entitled to a second attorney.[13] He spent less than half the defense investigation budget authorized by San Bernardino County.[14] He did not consult experts in endocrinology or toxicology, even though his investigator's limited efforts revealed evidence of diabetes and substance abuse, nor did he obtain all of Mayfield's medical records. We agree with the district court's observation that it was "deplorable that Ames did not

---

**12.** He claims to have spent more than 200 hours on the case but kept no billing records to substantiate his time. The state evidentiary referee found his claim that he spent more than 40 hours "inherently implausible."

**13.** Ames testified in the state evidentiary hearing that he was unaware of *Keenan* and that the local practice at the time in San Bernardino County was not to appoint a second defense attorney in capital cases.

**14.** His defense investigator spent only $1,001.25 interviewing the defendant and four other witnesses in the case, preparing interview memoranda, drafting subpoenas, and picking up medical records, which were dropped off at Ames' office.

put forth more of an effort when his client's life was at stake."

His performance during the penalty phase reflected his lack of preparation. Ames waived his opening argument, his first opportunity to "explain the significance" of the mitigating evidence to the jury. Although the state evidentiary referee listed no fewer than eighteen potential witnesses, Ames called only one during the penalty phase. Dr. Craig Rath provided mitigating testimony regarding Mayfield's family and childhood background, his health history including his diabetes, his work history, his psychiatric profile, and his substance abuse. Dr. Rath also shared with the jury a humanizing anecdote related to him by Mayfield's friend, Patricia Harper, that established that Mayfield could be a kind, generous human being. Dr. Rath, who interviewed Mayfield twice prior to the penalty phase, also told the jury that Mayfield had indicated considerable remorse for what he had done.

Ames did not call an endocrinologist to offer expert testimony regarding Mayfield's diabetes or a toxicologist to offer expert testimony regarding his substance abuse. He mistakenly stipulated that Mayfield's urine tested negative for PCP the day after the crime, indicating to the jury both that Mayfield did not have a substance abuse problem and that Mayfield had lied about it.

■ Ames did not call Mayfield's mother because he was afraid that her testimony would do more harm than good, given an incident in which Mayfield may have engaged in inappropriate sexual conduct with his infant sister when he was twelve. He did not call Mayfield's uncle, a pastor and substance abuse counselor, because he mistakenly believed that he had a recent felony conviction. He did not present any of Mayfield's other friends or family members simply because he did not expend the effort to locate and interview them. Ames also failed to explain to the jury the significance of the mitigating evidence presented by Dr. Rath during his closing argument, which the California Supreme Court described as "perfunctory." *People v. Mayfield*, 19 Cal.Rptr.2d 836, 852 P.2d at 349.

In short, Ames did not, as *Williams v. Taylor* requires, adequately investigate and prepare for the penalty phase or present and explain to the jury the significance of all the available mitigating evidence.

## 2. Prejudice at the Penalty Phase

■ We do not read *Williams* as establishing a *per se* rule that we must reverse a death sentence if we find that counsel's performance at the penalty phase was deficient. Instead, we read the opinion as saying that, applying the *Strickland* analysis, we must carefully weigh the mitigating evidence (both that which was introduced and that which was omitted or understated) against the aggravating evidence, *Williams*, 529 U.S. at 397, 120 S.Ct. 1495,[15] and determine whether there was "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. After reweighing all the evi-

---

**15.** *See also Clemons v. Mississippi*, 494 U.S. 738, 752, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (holding that because state supreme court's "opinion is virtually silent with respect to the particulars of the allegedly miti-

gating evidence presented … to the jury, we cannot be sure that the court fully heeded our cases emphasizing the importance of the sentencer's consideration of a defendant's mitigating evidence.").

dence, as required by these Supreme Court cases, we hold that if the jury had considered the mitigating evidence adduced at the state evidentiary hearing, in addition to that presented at trial, there is a reasonable probability that it might not have sentenced Mayfield to death.

The aggravating evidence against Mayfield was strong. Mayfield's conduct in planning the commission of the crime evidenced premeditation and malice, motivated by revenge against Ms. Pope and her son, Byron. Mayfield had recently been informed by his probation officer that he could expect to be sentenced to one year in jail for the auto theft conviction. He had failed to appear at his sentencing hearing when he crept over to the Popes' house under cover of night and, concealed below the living room window, overheard the victims talking about him. He swore he would get them. He armed himself with a .12–gauge, sawed-off shotgun and two shells, strategically placed in the elastic wristband of his jacket where they were readily retrievable. Using a screwdriver, he surreptitiously broke into the house through a bedroom window before confronting the victims.

The State played the videotaped confession and re-enactment for the jury at the guilt phase, depicting the gruesome circumstances of the shootings. After the murders, Mayfield meticulously cleaned up the scene of the crime, attempting to retrieve and dispose of incriminating evidence (picking up and throwing away spent shell casings, attempting to wipe fingerprints from the murder weapon, secreting it in a cushion at the nearby home of a friend, hiding the bodies in a storage area, and hosing blood off of the sidewalk). Then, armed with a knife, he lay in wait for the return of the remaining complainant, Byron Pope.

In addition to presenting the circumstances of the crime, the State presented in aggravation Wanda Griffin's testimony that Mayfield fired a gun into her house after she separated from him and another ex-girlfriend's testimony that Mayfield had struck her in the face.

██ Even in the face of this strong aggravating evidence, however, we must reverse Mayfield's death sentence if we cannot conclude with confidence that the jury would unanimously have sentenced him to death if Ames had presented and explained all of the available mitigating evidence. See *Williams*, 529 U.S. at 368–69, 399, 120 S.Ct. 1495 (reversing a death sentence for ineffective assistance at the penalty phase despite strong aggravating evidence). We cannot so conclude on this record.

██ The mitigation evidence presented at trial through the testimony of Dr. Rath was substantial. Mayfield was born in 1961. He had four siblings. His parents "separated when he was a child." Mayfield was diagnosed with diabetes at age nine. He had a hard time "accepting the idea that he was defective and diabetic." Mayfield was hospitalized 20 to 30 times and never had his diabetes under very good control. Dr. Rath described Mayfield's childhood as "all right, although there was growing tension with his mother as he got older to the point where there were disagreements and at least strong verbal altercations when he was in his early teens."

Dr. Rath testified that Mayfield was "in the low average range of intelligence." Mayfield had been diagnosed with a child behavioral disorder caused by depression. In his late teens, Mayfield began using PCP two or three times a week. Mayfield's mental state deteriorated because of drug usage. By the end of 1982, he was "using it basically on a daily basis."

Dr. Rath told the sentencing jury: "At the time of the offense, he apparently was living at home, although he would sporadically live with various girlfriends and so on." Dr. Rath testified that Mayfield was not under the influence of drugs or alcohol the night of the crimes, which may have been based in part on his mistaken belief that Mayfield's urine had tested negative for PCP.

Dr. Rath testified that Mayfield's score was moderately elevated in a "psychopathic deviance" test; that "he has some social problems in terms of his relation to society and the people around him;" that he was "sort of lacking in emotion, emotionally constrictive, emotionally immature, but not psychotic;" and that he had a bad temper. He testified that whether Mayfield is a violent person was "a difficult question," but that his conduct the night of the crime was "qualitatively different than most of his history."

Dr. Rath testified that Mayfield "indicated considerable remorse [over the lives he had taken] in different ways at different times." He further testified that Mayfield sometimes babysat for Pat Harper, who considered him a gentle person for whom the crimes were out of character, and that Mayfield had good rapport with the prison guards. Dr. Rath read for the jury the conclusion of Dr. Hunt, the neurologist, that "[a]lthough [Mayfield] has shown rather poor judgment in the past, particularly in caring for himself, the crime of which he is accused is out of character and can be explained only on the basis of definite cerebral impairment due to alcohol and drug abuse."

At the state evidentiary hearing, Mayfield presented additional mitigating evidence through the testimony of lay and expert witnesses. A psychiatrist testified that Mayfield was born to a fifteen-year-old, single mother. By the time Mayfield was diagnosed with diabetes at age nine, his mother had three more children by three separate fathers. She testified that Mayfield's childhood struggle with diabetes was "a real nightmare for him," punctuated by extended hospitalizations, depression, and refusal to talk or eat.

An endocrinologist explained the hardships of self-monitoring and self-medication borne by diabetics. In particular, Mayfield suffered abdominal and chest pain, dehydration, fatigue, dizziness, nausea, loss of consciousness, and comas. His mother testified that there were periods when Mayfield was hospitalized as often as five times a month and that his symptoms were sometimes so acute she had to call an ambulance.

She further testified that before he was diagnosed with diabetes Mayfield was clean and neat, went to school regularly, did his school work, enjoyed the company of other children, and got along well with his siblings. The endocrinologist testified that a diabetic's struggle with the psychological and physiological hardships of the disease can contribute to drastic changes in personality. According to the psychiatrist, Mayfield's mother, who gave him an insulin shot each day, became "the villain in his life." Mayfield became incorrigible and occasionally had physical altercations with her. Finally, when Mayfield was twelve, his mother sought the help of juvenile authorities.

During his stay with juvenile authorities, Mayfield was diagnosed with childhood behavioral disorder and depression. A psychological evaluation indicated that, although he had low-normal IQ, "he actually performed as though he were mildly retarded." Mayfield spent a month in Ward B of juvenile hall in 1974, indicating that he had again been diagnosed with a behavioral disorder or was considered a suicide risk.

Between the ages of fourteen and seventeen, Mayfield had his diabetes and emotions under better control. His hospitalizations decreased, he progressed in school, and he got a part-time job as a janitor.

When Mayfield was seventeen, his grandmother died and his mother moved the family from Redlands to San Bernardino, events the psychiatrist described as "stressors." Mayfield's diabetes-related hospitalizations increased. He began drinking and smoking marijuana to fit in with the tough kids of the San Bernardino projects. Marijuana acted as a "gateway drug," and it was not long before he was using PCP.

Friends and siblings testified that Mayfield's personality changed as a result of his drug and alcohol abuse and his poorly controlled diabetes. Mayfield's relationships with his mother and siblings deteriorated. His mother ordered him out of the house. He divided his nights, from then on, between Harper's house, Wafer's house, and a spare mattress in his mother's garage. In the months leading up to the crime, his alcohol and substance abuse was more frequent.[16]

The psychiatrist described the end of 1982 as "a growing onslaught of catastrophes, losses, and increased emotional turmoil that were boiling up," exacerbated by "the continued drug use that makes it more difficult for him to figure out what is the best thing to do and how to control his emotions in this situation." Mayfield's girlfriend, Wanda Griffin, three months pregnant with his son, broke up with him and refused to see him. Mayfield again considered suicide. That was when he fired a gun into Griffin's house. Two weeks later he struck another ex-girlfriend. He was hospitalized during this period with a blood sugar level of well over 1,100. He committed the crime a few months later.

A toxicologist testified at the evidentiary hearing that, in addition to suffering the acute toxicity experienced immediately after ingesting PCP, chronic abusers suffer long-term impairments. For instance, chronic PCP abuse aggravates preexisting psychological conditions, such as cognitive impairment, depression, and erratic mood swings. Its other effects can include "occasional bizarre episodes of acting out, including violent behavior," impaired judgment, decreased impulse control, decreased stress tolerance, and impaired reality testing.[17] Unlike acute PCP toxicity, chronic abuse generally does not result in memory loss.

The psychiatrist testified at the evidentiary hearing that Mayfield's denial to the police and the State's psychologist of a substance abuse problem was normal; substance abusers often deny they have a problem, particularly to figures of authority.

---

16. During the penalty phase, Ames stipulated before the jury that both Mayfield's blood and urine had been extracted after his arrest and tested for drugs and that both tested negative for PCP. Ames was mistaken. Only the blood was tested for PCP, not the urine. A urine screen would have been more definitive because, whereas blood may be tested for acute toxicity from ingestion within the last twenty-four hours, urine may reveal traces of chronic abuse of PCP ingested more than a month earlier.

17. We note that juries are unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's culpability for violent behavior. Ames testified that he knew of no death penalty cases tried in San Bernardino County prior to 1983 where a drug defense had been successful in gaining either an acquittal or in reducing the sentence from death to life without parole.

Several witnesses testified that Mayfield was helpful and generous with his time. Mayfield's younger brother, Cicero, and sister, Teresa, testified that Mayfield was a protective older brother. Cicero testified that Mayfield supported him by coming to his basketball practices after school. Mayfield babysat for Harper and assisted her in preparing projects for the local chapter of Head Start, where she was a teacher's aide. He cared for his wheelchair-bound uncle, Calvin Hawkins, by helping him with rehabilitation and taking him to medical appointments and to collect his disability payments.

Several witnesses indicated that Mayfield loved and interacted well with children. Wanda Griffin testified that she had been pregnant with Mayfield's son, who was born just before trial. She visited Mayfield in jail with their son when he was seven days old, and Mayfield seemed "happy and proud and blushing" and, although he tried to hide it, he got "watery eyes." Teresa Mayfield testified that Mayfield loved her children and that he had helped her son overcome a speech problem.

Hazel Hawkins testified that Mayfield's uncle, Willie Willingham, would have testified on his behalf. Willingham had overcome substance abuse problems and become a preacher and a drug and alcohol counselor. Several witnesses also testified that Mayfield was generally not a violent person. Mayfield's friends and family testified that they would have told the jury that they loved Mayfield and would have asked the jury to spare his life.

The jury deliberated for approximately four hours before sending a written question to the judge: "Must all 12 jurors agree for the sentence of life without parole?" The judge responded: "All jurors must agree if either verdict is reached." The jury deliberated an additional full day before it reached a verdict of death.

In light of the quantity and quality of the mitigating evidence Ames failed to present at trial, the duration of the jury's deliberations, and the jury's communication to the trial judge, we are not confident that, with the additional evidence presented at the evidentiary hearing, a unanimous jury would still have returned a sentence of death.[18] If the jury had considered the testimony of experts in endocrinology and toxicology, or of friends and family members relating additional humanizing stories, there is a "reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." 466 U.S. at 700, 104 S.Ct. 2052. Accordingly, we conclude that Mayfield was prejudiced by Ames' deficient performance at the penalty phase. We hold that Mayfield received ineffective assistance of counsel at the penalty phase in violation of his Sixth and Fourteenth Amendment rights and reverse the district court's denial of Mayfield's petition for a writ of habeas corpus on this ground.

### III

For the foregoing reasons, we grant Certificates of Appealability only with regard to Mayfield's claims of ineffective assistance of counsel at the guilt and penalty phases. We hold that, whether or not Mayfield's counsel performed deficiently at the guilt phase, Mayfield's claim for inef-

---

18. This holding is not, as it may at first appear, inconsistent with our holding in Section F that a competent performance by Ames would not have affected the jury's determination of guilt and death eligibility. "Mitigating evidence ... may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death eligibility case." *Williams*, 529 U.S. at 398, 120 S.Ct. 1495.

fective assistance at the guilt phase fails for lack of prejudice. We also hold, however, that a reasonable probability exists that the jury might not have sentenced him to death if the jury had considered the additional evidence presented at the state evidentiary hearing. We reverse the district court's denial of Mayfield's petition for habeas corpus. We remand the case to the district court with instructions to issue the writ on the ground that Mayfield received ineffective assistance of counsel at the penalty phase and we further direct the district court to return the case to the San Bernardino County Superior Court to conduct a new sentencing proceeding.

**AFFIRMED in part; REVERSED in part; REMANDED.**

GOULD, Circuit Judge, with whom SCHROEDER,[1] Chief Judge, and HAWKINS[2] and BERZON,[3] Circuit Judges, join as to the analysis in Part II, Concurring:

## I.

I concur in the majority's opinion and judgment that Mayfield is entitled to a new penalty phase hearing, or else to life imprisonment rather than death, because his counsel gave ineffective assistance in the penalty phase to his dire prejudice. I write separately to stress my views about prejudice at the penalty phase.

1. Chief Judge Schroeder also concurs in Judge Graber's dissent, and in Judge Hawkins' separate opinion, and does not concur in the judgment of the Court.

2. Judge Hawkins also concurs in Judge Graber's dissent and does not concur in the judgment of the Court, as is reflected in his separately filed concurrence and dissent.

3. Judge Berzon also concurs in the judgment of the Court, but not in the majority opinion.

4. An ancient Roman legal maxim provided: *in dubiis benigniora sunt semper prferenda.*

## II.

It is important to recognize that the jury in the end was considering the fate of a young man barely out of his teens who did not have an extensive record involving major crimes or violence. In my view, there is a reasonable probability that the result would have been different if Mayfield's counsel had called at least some family members or friends to testify in the penalty phase.

Mayfield is eligible for the death penalty because he was convicted, in a single proceeding, of two counts of first degree murder. *See* Cal.Penal Code § 190.2(a)(3). As pertinent to my analysis, Mayfield contends that his counsel's failure to present testimony from family members or friends to humanize Mayfield during the penalty phase was prejudicial. The district court rejected this claim, concluding that "had Ames presented the testimony of petitioner's friends and family at the penalty phase, the Court finds that no reasonable probability exists that the jury would have returned a sentence of life." *Mayfield v. Calderon,* 1997 WL 778685, at *18 (C.D.Cal.1997). I am not so sure this is right, indeed, I conclude it is wrong. On this prejudice issue Mayfield, for whom life or death hangs in the balance, deserves the benefit of the doubt.[4]

Dig. 50.17.56 ("Dig." refers to the Digesta of the Byzantine emperor Justinian I, circa 530 A.D. The Digesta was gathered by a commission of sixteen lawyers who examined the writings of all known jurists, extracting whatever they deemed valuable. *See* New Encyclopedia Britannica, v.6 665–66.) This phrase can be interpreted to mean: "In case of doubt it is best to lean to the side of mercy." H.L. Menken, *Dictionary of Quotations* 780 (Knopf 1966). Also, we find this maxim interpreted: "In doubtful cases, the more favorable are to be preferred." S.S. Peloubet, *Legal Maxims* 106 (Rothman 1985).

A claim of constitutionally ineffective assistance of counsel is shown when: (1) counsel's efforts in defense are "outside the wide range of professionally competent assistance;" and (2) the defense thereby suffers prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ames' deplorable efforts were far off the mark and plainly deficient for reasons explained by the majority opinion in part II G 1.

Although I share agreement with the majority's conclusion that counsel's performance offends the rule of *Williams v. Taylor,* 529 U.S. 362, 393, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), requiring counsel to present available mitigating evidence, I will comment on Ames' deficient defense work. The calling of only one witness in the penalty phase, with no attention to family members or friends who could personalize and humanize Mayfield, under the circumstances of this case, meets the first part of the test for constitutional deficiency. The law governing the sentencer's decision in the penalty phase gave the jury broad discretion to show mercy and spare life based on any consideration in Mayfield's background or character appealing to the jury. *See, e.g.,* Cal.Penal Code § 190.3 (allowing evidence of "defendant's character, background [and] history" to be presented during penalty phase); Cal.Penal Code § 190.3(k) (jury shall take into account "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime"). Notwithstanding the brutal murders for which he was convicted, family members or friends might have testified about humanizing aspects of Mayfield's personality.

Naturally, we do not second guess trial counsel on strategic decisions that prove to be unsuccessful. *See, e.g., Darden v. Wainwright,* 477 U.S. 168, 184–87, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (rejecting *Strickland* claim when counsel made strategic decision not to have family members testify). But the record does not disclose that counsel made a strategic decision to avoid testimony from family members.[5] To the contrary, counsel had not interviewed the family members, his investigator only interviewed a handful of people, and, from what appears in the record, Ames had no clue what they would say.[6]

And further, we find it interpreted, "In all case of doubt the most merciful construction of facts should be preferred." *Coffin v. United States,* 156 U.S. 432, 454, 15 S.Ct. 394, 39 L.Ed. 481 (1895). However interpreted, this ancient principle is not a stranger to our law. We require proof beyond a reasonable doubt to sustain a criminal conviction. *See Coffin,* 156 U.S. at 453–56, 15 S.Ct. 394 (collecting Roman law supporting the presumption of innocence and the requirement of guilt beyond a reasonable doubt); *In re Winship,* 397 U.S. 358, 361–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). *Cf. Lockett v. Ohio,* 438 U.S. 586, 604–5, 98 S.Ct. 2954, 57 L.Ed.2d 973 (sentencer must be allowed to consider "any aspect of defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"); *Callins v. Collins,* 510 U.S. 1141, 114 S.Ct. 1127, 1129, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting) (sentencer in capital case must be afforded "the power and discretion to grant mercy").

5. Indeed, in another case where counsel's deficient performance was caused by a "complete lack of effort," we noted that "[d]escribing [counsel's] conduct as 'strategic' strips that term of all substance." *Bloom v. Calderon,* 132 F.3d 1267, 1277 (9th Cir.1997) (citations omitted); *see also Smith v. Stewart,* 140 F.3d 1263, 1269–71 (9th Cir.1998) (granting habeas relief when, with little effort, counsel could have developed mitigating evidence).

6. Mark Hall, the defense investigator, interviewed Mayfield, Cicero Mayfield, Jr. (brother), Ivan Johnson (half-brother), Hazel Haw-

Further, even if counsel knew all that was presented by the family members in the evidentiary hearing, I see no substantial strategic reason for counsel to fail to call members of Mayfield's family, other than perhaps Mayfield's mother, to testify during the penalty phase.[7] Only Mayfield's mother possessed allegedly damaging information that Mayfield beat his mother and that, as a twelve year old, he may have sexually abused a younger sister. In the state court evidentiary hearing, Mayfield's sister and cousin were both specifically asked whether they had any knowledge of these incidents. Both said that they did not and in any event, it would not alter their opinion of Mayfield. There is no evidence that other family members had any knowledge of the possible sexual abuse.[8] Nor is it clear that, had any witness known of the incident, relating it to the jury would have been of great prejudice to Mayfield, because he was only twelve at the time of the incident.[9] I agree with the district court's assessment that "the cross-examination of the witnesses at trial, with the exception of petitioner's mother, would not have uncovered any information which would have outweighed the value of their testimony." *Mayfield*, 1997 WL 778685, at *16.

I conclude that Ames' failure in this case to call any family members or friends who could have humanized Mayfield falls well below "an objective standard of reasonableness," as required by the first prong of *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.[10]

Having so concluded, I am not comfortable with the speculative conclusion reached by the district court that it would not have mattered. I take a different view of the

kins (mother), and Tommy Wydrmyr (friend). Although Hall gave transcripts of these interviews to Dr. Rath so that the information could be included in his testimony at the penalty phase, only Ms. Hawkins and Cicero Mayfield had humanizing testimony about Mayfield. Johnson and Wydrmyr's testimony was only relevant to the question of diminished capacity.

7. Counsel also stated that he made a strategic choice not to call family members because he did not want to put on a "parade of family members." *Mayfield*, 1997 WL 778685, at *16. The district court correctly rejected this purported "strategy" because "trial counsel did not interview any of the potential witnesses, therefore, he had no informed basis upon which to make a tactical or strategic decision." *Id.*

8. In fact, Mayfield's mother testified during the evidentiary hearing that she told no one about the incident, other than one close friend, court officials, and Mayfield's defense investigator. When interviewed by the defense investigator, Mayfield's mother told her other children to leave the room before discussing the possible sexual abuse.

9. Even if this had come out through some family member's testimony that was other-

wise positive, it seems nonetheless speculative to assume that a jury would have voted to terminate Mayfield's life in any substantial part because of an offensive and even perverted act as a twelve year old. It seems much more probable that a jury would have focused on the violence of the murders, on the one hand, and any exculpatory evidence of Mayfield's conduct that was more proximate to the murders, on the other. Doubtless the jury would care about twenty-two year old Mayfield's conduct as a teenager, but the jurors would be much less likely to give controlling weight to an evil deed done at the age of twelve.

10. I do not suggest that it is ineffective to fail to call all possible family members or friends or business associates or others who could humanize a defendant before a jury tasked with deciding life or death under broad statutory guidelines. Had counsel called any family member to testify, failure to call others would likely be seen as a strategic decision which could not properly be second-guessed in this proceeding. But to call none who would talk about Mayfield's human characteristics and even plead for mercy is to do too little.

analysis of prejudice than that of the district court. The district court seems to have believed that, despite the wealth of potentially humanizing evidence that Ames neglected to discover and introduce, the sentence was basically decided, along with the verdict of guilt, by the defendant's videotaped confession and reenactment. *Williams*, however, reminds us: "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398, 120 S.Ct. 1495.

And the Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), has also unequivocally declared:

> To provide the individualized sentencing determination required by the Eighth Amendment ... the sentencer must be allowed to consider mitigating evidence. Indeed, as *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), made clear, "in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."

*Penry*, 492 U.S. at 316, 109 S.Ct. 2934 (internal citations omitted).

In cases involving even greater aggravating circumstances than here, we have found that counsel's failure to present mitigating evidence during the penalty phase of the trial was prejudicial. *See Mak v. Blodgett*, 970 F.2d 614, 620–22 (9th Cir. 1992) (affirming habeas relief when counsel failed to present mitigating evidence during the penalty phase; defendant was convicted of murdering thirteen people in a single night); *see also Bean v. Calderon*, 163 F.3d 1073, 1080–81 (9th Cir.1998) (finding prejudice where family portrait was an "unfocused snapshot;" other mitigating evidence was presented "only in the vaguest of terms"). In another case, we ordered an evidentiary hearing into a defendant's ineffective assistance claim, rejecting the district court's view that testimony from the defendant, the defendant's ex-girlfriend, and a medical expert adequately covered defendant's childhood. *Hendricks v. Vasquez*, 974 F.2d 1099, 1109–10 (9th Cir.1992). Three years later, we affirmed habeas relief in Hendricks' case, writing:

> The determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The [California] statutory factors give the jury broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability. Presumably the imposition of a death sentence is entrusted to a jury because it is a uniquely moral decision in which bright line rules have a limited place. In light of the whole record, and despite the substantial evidence of aggravation, we conclude that the failure of [counsel] to present mitigating evidence rendered the sentencing hearing neither fair nor reliable.

*Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9th Cir.1995).

I conclude that this is such a case. Of course, we cannot be absolutely certain how testimony that was not presented would have affected the possibility that the jury would have shown mercy. But our law does not require certainty in this context. Instead, prejudice is shown where there is a "reasonable probability" of a different result: a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

As the Fifth Circuit has noted in *Neal v. Puckett*, 239 F.3d 683 (5th Cir.2001), in a state requiring a unanimous sentence, there need only be a reasonable probability that "at least one juror could reasonably have determined that ... death was not an appropriate sentence." 239 F.3d at 691–92 (footnote omitted).

Applying that rule here, we must consider whether testimony from family members and friends could have humanized Mayfield, and we must assess the probable impact of Ames' failure to do so on the jury's penalty phase deliberations. In the best case scenario for Mayfield, such testimony from family members might have supported the view that Mayfield's cold-blooded murders of Ora Mae Pope and Edward John Moreno, while heinous, were out of character for him and at odds with his past behavior. But even if the humanizing witnesses could not have shown that much, there is still the real probability that they could have presented a sincere statement that Mayfield was not all bad. In this vein, the record developed in the state court evidentiary hearing suggests the following: a sister would have said that Mayfield was a gentle person and a peacemaker in the family; a brother would have said that Mayfield steered him away from gangs and drugs; an uncle would have said that Mayfield helped him when the uncle was disabled; and a cousin would have said that her children looked up to Mayfield and that Mayfield helped her four-year old overcome a speech impediment. *See Wade v. Calderon*, 29 F.3d 1312, 1323–25 (9th Cir.1994) (granting habeas relief because petitioner was severely prejudiced by counsel's deficient performance at a capital trial, including his failure to prepare and investigate favorable

witnesses; counsel in *Wade* was the same Ames who here represented Mayfield).

We have held that such humanizing testimony may be presented to a jury in a capital case and the failure to produce it can show prejudice. *See Siripongs v. Calderon*, 35 F.3d 1308, 1315–16 (9th Cir.1994) (granting an evidentiary hearing when counsel made only a "cursory investigation" of defendant's background and made "no attempt to humanize him before the jury"); *Mayes v. Gibson*, 210 F.3d 1284, 1290–91 (10th Cir.2000) (granting an evidentiary hearing where trial counsel did not call family or friends to testify regarding defendant's character).

The potential effect of mitigating testimony from family members is more likely to be significant when, as here, the aggravating factors are not overwhelming.[1] In defendant's case, the aggravating factors are: (1) two convictions in a single proceeding for first degree murder, (2) a 1982 conviction for a battery on the person of Mayfield's ex-girlfriend, and (3) a 1982 arrest for discharging a firearm in an inhabited residence. Like *Bean v. Calderon*, "this is not a case in which a death sentence was inevitable because of the enormity of the aggravating circumstances." 163 F.3d at 1081 (affirming habeas relief on *Strickland* claim when aggravating factors were: (1) burglary conviction, and (2) altercation in which defendant fired a shotgun). We have noted that prejudice is "especially likely" in cases like *Bean* where the aggravating factors are not overwhelming. *Lambright v. Stewart*, 241 F.3d 1201, 1208 (9th Cir.2001).

If it can be discerned, an examination of the jury's deliberations is relevant to the question of prejudice. In *Bean*, we said:

---

1. In fact, the trial court judge commented that he had never understood why the state sought death in Mayfield's case.

[W]e find it noteworthy that the jury was initially divided over the appropriateness of the death penalty, deadlocking as to both murders before ultimately returning a death verdict.

163 F.3d at 1081. *See also Murtishaw v. Woodford,* 255 F.3d 926, 974 (9th Cir.2001) (granting habeas relief based, in part, on "length of the jury's deliberations"); *Mayes,* 210 F.3d at 1291 (granting evidentiary hearing on *Strickland* claim due to the "relative weakness of the State's case, the jury's obvious struggle in deliberations, and the fact that only one aggravator was found").

The jury only took two hours to arrive at a guilty verdict, concluding that there were two intentional murders, but the penalty phase was more difficult. Ames testified that the jury foreman told him that the jury "agonized over the question of penalty;" that on the first ballot during the penalty phase six jurors were in favor of life imprisonment, five in favor of the death penalty, and one undecided; and that eight ballots were taken before the jury finally arrived at a death sentence. While we cannot be certain of these points, we do know that the jury deliberated for nearly two days before reaching a sentence of death. We also know that the jury sent out a note asking whether all jurors must reach a unanimous verdict for a life sentence. The jury struggled on the limited penalty-phase record presented with whether death was the right penalty. We cannot be sure that the jury would not have concluded otherwise if family members had drawn a picture of Mayfield's positive characteristics, had shown affection for him, and had directly or indirectly made a pitch for mercy. We cannot be sure that the jury would not have decided, in the words of John Milton, to "temper justice with mercy." John Milton, *Paradise Lost,* book x, lines 77–78, (1674 ed.).

It must be acknowledged that some of our sister circuits, in cases predating *Williams v. Taylor* and involving differing facts, have concluded that failure to call witnesses during the penalty phase to humanize the defendant was not prejudicial. *See Card v. Dugger,* 911 F.2d 1494, 1508–11 (11th Cir.1990) (rejecting argument that counsel prejudiced defendant in relying on a psychologist as the sole witness during penalty phase rather then seeking more detailed testimony from family members); *Williams v. Cain,* 125 F.3d 269, 278–280 (5th Cir.1997) (finding no prejudice in failure to call family and friends when such testimony could have opened the door to testimony regarding drug use, expulsion from school, and discharge from job; positive testimony "would have had little mitigating effect against the aggravating evidence"). To a degree, these precedents argue against a determination of prejudice here. However, *Strickland* does not establish "mechanical rules." 466 U.S. at 696, 104 S.Ct. 2052. To the contrary, the *Strickland* inquiry is fact-specific, requiring examination of "the totality of the evidence." *Id.* at 695, 104 S.Ct. 2052. The facts of Mayfield's case are distinguishable because family members, except for Mayfield's mother, did not have damaging testimony and the aggravating circumstances were not as severe as in both of the aforementioned cases.

As Shakespeare reminded us: "The quality of mercy is not strain'd, It droppeth as the gentle rain from heaven Upon the place beneath."[2] So too, in our analysis of prejudice, we must remind ourselves that the possibility of mercy, like the possibility of gentle rain, is not predictable with certainty. It was the jury's duty to consider the possibility of mercy based on

---

**2.** William Shakespeare, *The Merchant of Venice,* act IV, sc. 1.

statutory factors that gave the jury a broad sway for action. Ames' failure to humanize Mayfield lost a good chance for the jury's mercy and undermines confidence in the penalty phase.

The jury's struggle in this case without humanizing testimony suggests a reasonable probability of a life sentence had such testimony been presented. The family members had something to say. Given Mayfield's youth and limited prior record, Mayfield meets his burden to show prejudice because there is a good chance that counsel's substandard performance prejudiced the defendant at sentencing; there is a "probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

The Sixth and Eighth Amendments, as incorporated by the Fourteenth Amendment's due process clause, require us to grant the defendant's habeas petition, vacate his sentence, and remand for re-sentencing. *See Penry,* 492 U.S. at 328, 109 S.Ct. 2934 ("Our reasoning in *Lockett* [*v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ] ... thus compels a remand for resentencing so that we do not 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.' *Lockett,* 438 U.S. at 605, 98 S.Ct. 2954. 'When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.' *Lockett, supra,* at 605, 98 S.Ct. 2954.") (internal citations omitted).

### III.

I agree with the opinion and judgment that it is correct to deny the petition for writ of habeas corpus as to the conviction, but grant the petition with respect to the sentence, giving the state the option of either accepting the imposition of a life sentence without parole or holding a new penalty phase hearing.

GRABER, Circuit Judge, with whom SCHROEDER, Chief Judge, and HAWKINS and RAWLINSON, Circuit Judges, join, dissenting:

Defense counsel in this case abandoned his duty of loyalty to his client and thereby created a conflict of interest from which prejudice in the guilt phase of the trial must be presumed. I therefore disagree with Part II(E) of the majority's opinion and, accordingly, dissent.

As the Supreme Court of the United States reminded us recently, "there are a few situations in which prejudice may be presumed" in the analysis of an ineffective-assistance-of-counsel claim. *Williams v. Taylor,* 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). One of those situations is

> when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.

*Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In that kind of situation, "the process loses its character as a confrontation between adversaries," and the Sixth Amendment guarantee of the assistance of counsel is violated. *United States v. Cronic,* 466 U.S. 648, 656–57, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

Petitioner, Demetrie Ladon Mayfield, is an African American. His lawyer, S. Donald Ames, harbors deep and utter contempt for African Americans. As one of Ames' daughters puts it:

> His contempt for us [his family] was exceeded only by his contempt for peo-

ple of other races and ethnic groups. He especially ridiculed black people, referring to them with racial invectives. He used such terms and phrases as "nigger," "schwartze," "jig," "jungle bunnies," "trigger the nigger," and "shoot the coon to the moon."

Ames' former secretary states that he "consistently" referred to his African American clients as "niggers"; called another secretary "a dumb nigger"; and called a fellow lawyer "a big black nigger trying to be a white man." Another former employee avers that Ames "said because his client [not Petitioner] was black he, Ames, did not trust him and did not care what happened to him." An employee of the superior court says, in her affidavit, that Ames described a former secretary as a "dumb little nigger" and that he said of a minority death penalty client (not Petitioner) that "he deserves to fry." An investigator states that Ames referred to yet another African American client as a "dumb nigger."

The majority correctly points out that the Supreme Court has not held that racial prejudice against a client is a cognizable form of conflict of interest. (Maj. op. at 924.) It also is true that a criminal defendant is not entitled to have a particular lawyer, or even a lawyer with whom the defendant feels rapport. *Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). But a capital defendant is entitled to the assistance of *a* lawyer who actually maintains a duty of loyalty to him or her. The Supreme Court has called "the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. There is no principled reason why *any* factor, extraneous to the case, which causes a lawyer to abandon altogether "the duty of loyalty" cannot qualify as a factor that undermines a defendant's Sixth Amendment right to the assistance of counsel.

"A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest. Such an attorney, like unwanted counsel, 'represents' the defendant only through a tenuous and unacceptable legal fiction.' " *Faretta v. California,* 422 U.S. 806, 821, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition."

*United States v. Swanson,* 943 F.2d 1070, 1075 (9th Cir.1991) (quoting *Osborn v. Shillinger,* 861 F.2d 612, 629 (10th Cir. 1988)).

Here, Ames made his sympathies to the prosecution's position manifest not only by what he failed to do, but also by what he did do. What he failed to do was prepare or investigate, having spent only 40 hours to get ready for the guilt and penalty phases of a capital trial. According to the district court, "Ames's trial notebook contained no handwritten notes, no legal research, and no handwritten indications of out-of-court preparation." *Mayfield v. Calderon,* No. CV 94–6011 ER, 1997 WL 778685, at *3 (C.D.Cal. Oct.27, 1997). Ames failed to hire associate counsel, although he had the right to do so. He used only about $1,000 of the $7,500 budget for an investigator; much of that represented activities other than actual investigation. (Maj. op. at 927.) Ames did not interview Petitioner until the morning of trial, when they met at the courthouse. Although the trial judge "wanted to settle the case by

having [P]etitioner plead guilty for a sentence of life without parole[,] Ames did not discuss possible defenses with [P]etitioner" and proceeded to trial. 1997 WL 778685, at *4.

If the record stopped there, I might agree with the majority that Ames' antipathy to African Americans could not necessarily be linked with his incompetent performance. (Maj. op. at 925.) But Ames did much more than serve his client indifferently; he actively served the interests of the prosecution. On this record, there is no other explanation than a racially motivated breach of the duty of loyalty to Petitioner and concomitant sympathy to the prosecution's position.

At the guilt phase of the trial, the prosecutor introduced Petitioner's videotaped confession and re-enactment of the crime, as well as an excerpt of his audiotaped confession. In both, Petitioner consistently maintained that he intended to confront and scare Ora Mae Pope but had killed her by accident when she lurched forward to get a cigarette. Had the jury held a reasonable doubt, based on that account, that the killing of Ms. Pope was first-degree murder, then Petitioner would not have been eligible for the death penalty.

Ames made no opening statement to point this out to the jury. The only evidence that he introduced affirmatively during the defense case was the full audiotape of the police interview with Petitioner. That evidence irreparably damaged Petitioner and significantly helped the state. In the tape that Ames played for the jury, Petitioner at first insistently denied any involvement in the crime. In other words, in a case that depended entirely on the jury's believing Petitioner when he said that the first killing was accidental, Petitioner's own lawyer introduced evidence proving that Petitioner had lied. Moreover, as the majority notes, p. 925, the tape needlessly revealed other damning admissions, such as Petitioner's acknowledgments that he put Ms. Pope into the storage closet while she was still alive; that he had been in fights; that he had received probation for firing a gun inside city limits; and that he possessed a "short temper." Nor did Ames present a favorable closing argument. For example, Ames reminded the jury that his client denied any involvement in the killings "until page 88" of the transcript, when he finally confessed after being confronted with evidence against him. He also reminded the jury that Petitioner had admitted to involuntary manslaughter of Ms. Pope—"at the very least"—and to "at least a first or second degree murder" of the other victim. And he mused about why Petitioner might have brought two shells with him if he did not premeditate the murders—another argument for the prosecution.

I cannot fault the majority's analysis concerning lack of prejudice at the guilt phase. But this is one of the rare cases in which "defense" counsel's sympathies so obviously and cynically belonged to the prosecution that Petitioner received the equivalent of no counsel at all.

I have no hesitation in upholding a capital conviction. *See, e.g., Lambright v. Stewart,* 191 F.3d 1181 (9th Cir.1999) (en banc); *State v. Moore,* 324 Or. 396, 927 P.2d 1073 (1996) (en banc); *State v. Montez,* 324 Or. 343, 927 P.2d 64 (1996) (en banc); *Wright v. Thompson,* 324 Or. 153, 922 P.2d 1224 (1996) (en banc); *Bryant v. Thompson,* 324 Or. 141, 922 P.2d 1219 (1996) (en banc); *State v. Wright,* 323 Or. 8, 913 P.2d 321 (1996) (en banc); *State v. Guzek,* 322 Or. 245, 906 P.2d 272 (1995) (en banc) (Graber, J., dissenting); *State v. Pinnell,* 319 Or. 438, 877 P.2d 635 (1994) (en banc); *State v. Smith,* 319 Or. 37, 872 P.2d 966 (1994); *State v. Johnson,* 313 Or.

189, 832 P.2d 443 (1992) (en banc) (Graber, J., dissenting). But in every case in which I have done so, the defendant had counsel who represented his interests. In, conscience, I cannot uphold a conviction that results from a trial in which both the defendant's lawyer and the prosecutor represented the interests of the state.

I respectfully dissent.

HAWKINS, Circuit Judge, with whom SCHROEDER, Chief Judge, joins, concurring in part and dissenting in part:

I join Judge Graber's compelling dissent and write separately to state my agreement with the majority analysis as to error in the sentencing phase. Of course, the normal consequence of the position Judge Graber so eloquently urges would be to give Mr. Mayfield a new trial on all issues, including a new sentencing hearing if a conviction resulted on retrial. I agree with both positions because Donald Ames performed in the same inadequate fashion in the guilt *and* in the sentencing phases. Guilt and sentence were tried seriatim and the performance of Ames, deeply influenced by the conflict of his ill-disguised racism, was consistently inadequate. Ames's lack of preparation and bumbling presentation helped seal Mayfield's guilt, his woeful approach to sentencing ensured Mayfield the gallows.

It is a painful truth of the death penalty process that these most serious cases sometimes draw the least adequate trial counsel.[1] I join Judge Graber in concluding that the deeply conflicted counsel Mayfield had at trial was the functional equivalent of no counsel at all, and I also embrace the analysis which shows that the representation at sentencing was no better.

---

1. Both Justices O'Connor and Ginsburg have recently expressed this concern in public comments. Justice O'Connor said, "Perhaps its time to look at minimum standards for appointed counsel in death cases and adequate compensation for appointed counsel when they are used." *Justice O'Connor Doubts Fairness of Death Penalty,* L.A. Times, July 3, 2001. Justice Ginsburg went even further, "I have yet to see a death case, among the dozens coming to the Supreme Court on the eve of execution petitions, in which the defendant was well represented at trial." *O'Connor Expresses Doubts About Death Penalty: U.S. Justice Points to Exoneration of 90 Death–Row Inmates,* Dallas Morning News, July 4, 2001. *See also* Stephen B. Bright, *Will the Death Penalty Remain Alive in the Twenty–First Century?: International Norms, Discrimination, Arbitrariness, and the Risk of Executing the Innocent,* 2001 Wis. L.Rev. 1, 17–22 (discussing inadequacy of counsel in capital cases).